**Charles Sylvester STAMPER**

v.

**Alton BASKERVILLE.**

**Civ. A. No. 82–0025–R.**

United States District Court,
E. D. Virginia,
Richmond Division.

Feb. 12, 1982.

Edward D. Barnes, Denis C. Englisby, Chesterfield, Va., Gary J. Spahn, Richmond, Va., for plaintiff.

Thomas D. Bagwell, Asst. Atty. Gen., Richmond, Va., for defendant.

## MEMORANDUM

WARRINER, District Judge.

Charles Sylvester Stamper, a prisoner of the Commonwealth of Virginia, brings this petition for a writ of habeas corpus pursuant to provisions of 28 U.S.C. § 2254. Petitioner was convicted on 9 February 1979 in the Circuit Court of Henrico County, Va., of three counts of capital murder, three counts of use of a firearm in the commission of a felony, and one count of armed robbery. He was sentenced to death by electrocution for each count of capital murder, one year imprisonment for each count of use of a firearm in the commission of a felony, and life imprisonment for armed robbery. Petitioner is attacking the validity of the aforementioned convictions, and the application of the death penalty. He asserts the following allegations in support of his petition:

1) that the evidence was insufficient to justify a finding of guilt beyond a reasonable doubt;

2) that the evidence was insufficient to show that a robbery took place at the time the murders were committed;

3) that evidence was introduced at trial produced by an illegal search and seizure;

4) that the trial court erred in permitting into evidence a video tape and sound recording of a partial view of the murder scene because it had no probative value and was designed to inflame the passions and prejudices of the jury;

5) that the trial court erred in failing to ask defendant if there were anything he wanted to say prior to sentencing in accordance with Va.Code § 19.2—298 and Rule 3A:25(b);

6) that the trial court erred in not requiring a full and complete pre-sentence report;

7) that the trial court erred in permitting the introduction of the pistol and the glass particles because their probative value was outweighed by their prejudicial effect;

8) that the trial court erred in permitting the testimony in the sentencing phase of Deanie Ellsworth regarding the facts of a previous assault and in permitting Ellsworth to exhibit his injuries to the jury;

9) that the trial court erred in refusing to dismiss the indictments regarding the capital murder offenses for the reason that the indictments violate petitioner's rights under the Fifth, Eighth and Fourteenth Amendments of the United States Constitution;

10) that the death penalty constitutes cruel and unusual punishment;

11) that the Virginia death penalty statute, § 19.2—264.4 (1980 cum. supp.) is unconstitutional as applied to petitioner in the case at bar.

Respondent has filed his answer to the petition and oral argument has been heard.

### Pertinent Facts

Recognizing that the manner of speaking, the demeanor of the witness, the pauses, the evidences of uncertainty, or certainty, the evidences of nervousness, or calm, the indications of bias, or indifference, the raised eyebrow or the trembling chin, the emphatic response, or the vocal tremor, the direct or averted gaze—all the body language and other non-verbal bases for determining the truth—are hidden from me but were open to the trial judge and jury, I have reviewed the transcript of the State court trial in its entirety and, having compared my findings with those of the Supreme Court of Virginia, I agree with and adopt its recitation of the evidence. *Stamper v. Commonwealth,* 220 Va. 260, 264–67, 257 S.E.2d 808, 812–14 (1979) *cert. denied,* 445 U.S. 972, 100 S.Ct. 1666, 64 L.Ed.2d 249 (1980).

### Sufficiency of the Evidence

■ On habeas corpus review

The relevant question is whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements [1] of the crime beyond a rea-

1. "This standard must be applied with explicit

reference to the substantive elements of the

sonable doubt. (citation omitted). This familiar standard gives full play to the responsibility of the trier of fact to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.

*Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). In measuring the insufficiency claim this Court must follow the *Jackson* rule rather than the Virginia rule.[2]

■ It is well settled that circumstantial evidence may support a verdict of guilty, even though it does not exclude every reasonable hypothesis consistent with innocence. *United States v. George,* 568 F.2d 1064, 1069 (4th Cir. 1978); *United States v. Bobo,* 477 F.2d 974, 989 (4th Cir.) *cert. denied,* 421 U.S. 909, 95 S.Ct. 1557, 43 L.Ed.2d 774 (1973).

■ In the instant action there is an abundance of circumstances from which reasonable inferences can be drawn to lead a rational trier of fact to the conclusion that Stamper was involved in these crimes. A reasonable inference from the evidence is that the crimes were committed by a Shoney's employee. The evidence proved that only employees were admitted to the restaurant prior to 7:00 a. m. It is reasonable to infer that the perpetrator forced Staples to open the safe. Staples was the only one of the victims who knew the safe's combination, a fact which would not likely be known to a non-employee. The killer had apparently made his escape by breaking out the glass in the front door rather than using the fire exit; only employees might reasonably be expected to know that the fire door was connected to an alarm which automatically triggered when the door was opened. All of the employees that were in the restaurant were murdered, even though Staples apparently cooperated by opening the safe. This fact raises an inference that the killer was known to the murdered employees and that they were killed in order to eliminate eye witnesses. The evidence showed that Stamper was employed as a weekday breakfast cook at the restaurant.

The evidence indicated that the automobile seen near Shoney's at the approximate time of the crime was an automobile similar to that owned by Stamper's wife, a yellow Ford Torino. When Stamper was stopped by the police on the evening of 25 March 1978 he stated that he had been in exclusive control of the automobile that day. Approximately twenty percent of the glass particles taken from the floorboard of the driver's side of Stamper's car had the same refractive index as glass from the Shoney's door. In the opinion of the expert witness this similarity was "significant".

Steven Staples' car keys and a .22 caliber revolver were found within a few hundred yards of Charles Stamper's parents' home. The .22 caliber revolver which was recovered near Stamper's parents' home, contained four expended cartridges and four unfired cartridges. The firearm's expert opined that three of the expended cartridges originally contained copper-coated bullets and one contained a plain lead bullet. Of the four .22 caliber bullets recovered from the bodies of the victims, three

---

criminal offense as defined by State law." *Jackson v. Virginia,* 443 U.S. at 324 n. 16, 99 S.Ct. at 2792 n. 16. To convict of capital murder under § 18.2—31(d) of the Code of Virginia, the Commonwealth must establish all of the elements necessary to convict of first-degree murder, i.e., that the killing was willful, deliberate, and premeditated and, in addition, all of the elements necessary to convict of an armed robbery, i.e., the taking, with intent to steal, of the personal property of another from his person or in his presence, against his will, by violence or intimidation while armed with a deadly weapon. *Johnson v. Commonwealth,* 221 Va. 736, 273 S.E.2d 784, 787 (1981); *Jones*

*v. Commonwealth,* 218 Va. 18, 21, 235 S.E.2d 313, 315 (1977).

When the offense constituting the charge of capital murder is the willful, deliberate and premeditated killing of a person in the commission of robbery while armed with a deadly weapon, only the actual perpetrator of the crime, i.e., the "triggerman", may be convicted of capital murder. *Harrison v. Commonwealth,* 220 Va. 188, 191, 257 S.E.2d 777, 779 (1979).

**2.** Virginia law requires the exclusion of every reasonable hypothesis of innocence. *Cameron v. Commonwealth,* 211 Va. 108, 110, 175 S.E.2d 275, 276 (1970).

were copper-coated and one was plain lead. A test bullet fired from the revolver demonstrated the same general characteristics as the bullets recovered from the victims.[3] It is, therefore, a reasonable inference that the .22 caliber revolver recovered from the woods, was in fact the murder weapon, and that it was hidden by Stamper in the woods in order to avoid detection.

The evidence proved that during March 1978, Stamper was delinquent on his rent and on his account with a credit jewelry store. He had given notice on 20 March that he was quitting his job at Shoney's because he needed to earn more money. However, within a few days after the crimes, petitioner attempted to purchase an automobile priced at $3,500.00, stating that he had $1,500.00 in his pocket to use for a downpayment. Petitioner also paid his past due rent, paid off a civil judgment in the amount of $63.55, paid $100.00 as downpayment on a $180.00 watch, and co-signed a note for a friend in the amount of $355.00.

Petitioner also claims that the evidence was insufficient to show that a robbery took place at the time the murders were committed.[4] The testimony proved that there was substantial money in the safe on the night prior to the murders. However, after the murders, the safe was found to be open and the money was missing. There was also blood on the safe and surrounding cabinets. Steven Staples, the only one of the victims with the combination to the safe, had been beaten and cut with a sharp instrument prior to his death.

As stated earlier in the opinion, the jury is entitled to draw reasonable inferences from the facts adduced at trial. It is the opinion of the Court that the jury could have reasonably inferred from the facts that the motivation for the murders was robbery, that the robber knew who had the combination to the safe, that the robber tortured that person to make him open the

safe, and that the robber killed all of the employees once the safe was open and he had access to the $4,000.00 taken from the safe.

■ Under Virginia law, robbery is defined as "the taking, with intent to steal, of the personal property of another, from his person or in his presence, against his will, by violence or intimidation." *Jones v. Commonwealth*, 218 Va. 18, 21, 235 S.E.2d 313, 315 (1977). The violence or intimidation that is an essential ingredient of robbery must proceed or be concomitant with the taking. *Mason v. Commonwealth*, 200 Va. 253, 255–56, 105 S.E.2d 149, 151 (1958); *see also Whitley v. Commonwealth*, 222 Va. ——, 286 S.E.2d 162 (1982).

Upon consideration of the evidence at trial, and viewing it in the light most favorable to the prosecution, the Court is of the opinion that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Circumstantial evidence cannot be expected to weave an airtight case. But the Constitution doesn't hold the Commonwealth to such a measure of proof. Proof beyond a reasonable doubt is required. Accordingly, this claim for relief will be dismissed.

### Fourth Amendment Claim

■ Next, petitioner claims that certain evidence admitted at trial was the fruit of an illegal search and seizure. In *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), the Supreme Court held that State prisoners may not collaterally attack State convictions on the grounds that illegal evidence was admitted at trial where the "[S]tate has provided an opportunity for full and fair litigation of the Fourth Amendment claim." 428 U.S. at 494, 96 S.Ct. at 3052. The record indicates that petitioner's Fourth Amendment claim was raised at his trial in State trial court

---

**3.** Corrosion of the pistol made impossible a positive determination that the bullets were or were not fired from the pistol. It was positively determined that the bullets could have been fired from the pistol and the copper/lead coincidence buttressed the inference that they were.

**4.** In order to convict a person of capital murder the Commonwealth must also establish all of the elements of armed robbery. See n. 1, *supra*.

and on his appeal to the Supreme Court of Virginia. No unfairness nor any less than a full hearing is pointed to by petitioner. The Court's examination of the record shows no complaint on this ground would be justified. The Court concludes, therefore, that petitioner has had a full and fair opportunity to present these claims to the Virginia courts. Accordingly, this claim will be dismissed. *Stone v. Powell, supra; Doleman v. Muncy,* 579 F.2d 1258 (4th Cir. 1978).

### Admissibility of Evidence

■ Petitioner's next contention is that the trial judge failed to restrict certain evidence regarding the glass particles taken from Stamper's car, Steven Staples' keys found in the woods near Stamper's parents' home, the revolver also found near Stamper's parents' home, a video tape and sound recording of a view of the scene of the crime, and the testimony of Deanie Ellsworth regarding the facts of a previous assault and robbery on him. The Court finds the rule of *Grundler v. North Carolina,* 283 F.2d 798 (4th Cir. 1960) to be controlling. "Normally, the admissibility of evidence... in State trials [is a] matter of State law and procedure not involving federal constitutional issues." *Id.* at 802. There exists no indication of fundamental unfairness in the admission of this evidence. *See United States v. Caldwell,* 543 F.2d 1333, 1360 (D.C.Cir.1974) *cert. denied,* 423 U.S. 1087, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976); *United States v. Heinlein,* 490 F.2d 725, 737 (D.C.Cir.1973). These claims will therefore be dismissed.

### Right of Allocution

■ Next, petitioner claims that he was denied his right of allocution as required by Va.Code § 19.2—298 by the trial court's failure to inquire whether he had any statement to make prior to his sentencing.

While the transcript fails to show that the trial court called petitioner's attention to the right of allocution, such a hearing is not constitutionally required. *Hill v. United States,* 368 U.S. 424, 428, 82 S.Ct. 468, 471, 7 L.Ed.2d 417 (1962). In *Ashe v. North Carolina,* 586 F.2d 334, 336 (4th Cir. 1978), *cert. denied,* 441 U.S. 966, 99 S.Ct. 2416, 60 L.Ed.2d 1072 (1979), the Fourth Circuit held that "when a defendant effectively communicates his desire to the trial judge to speak prior to the imposition of sentence, it is a denial of due process not to grant the defendant's request." *Id.* 586 F.2d at 336. The record of Stamper's trial, though he was represented by experienced criminal lawyers, shows that he did not inform the trial judge of his desire to speak before sentencing.[5] Indeed, the evidence at a habeas corpus hearing before this Court shows that counsel was well aware of the omission at the time and chose to forbear objecting on the hope that the trial court's failure would be deemed "clear error" on appeal. Counsel's tactical decision proved unavailing. This claim for relief will be dismissed.

### Pre-sentence Report

■ Next, petitioner claims that he was denied a full and complete pre-sentence report. Petitioner points out that the probation officer who prepared petitioner's pre-sentence report used as a basis for a portion of his pre-sentence report a pre-sentence report which had been prepared several years earlier, and that the probation officer did not again contact petitioner's family or discuss the matter with petitioner's wife. For this reason, petitioner claims that he was denied due process and equal protection.

■ In the ordinary case the issue of whether petitioner is entitled to a pre-sentence report at all is a matter of State law

5. The final order entered by the trial court on 9 February 1979, contains the following language:

Whereupon, the Court taking into consideration all of the evidence in the cases, the report of the Probation Officer, the matters brought out on cross-examination of the Probation Officer and such additional facts as were presented by the defendant, *and it being demanded of the defendant if anything for himself he had or knew to say why judgment should not be pronounced against him according to law, and nothing being offered or alleged in delay of judgment, it is accordingly the judgment of this Court....* (emphasis added)

and not cognizable under a petition for a writ of habeas corpus. *Lawson v. Riddle*, 401 F.Supp. 410, 412 (W.D.Va.1975); *Hawks v. Peyton*, 288 F.Supp. 94, 96 (W.D.Va. 1968). In a capital case "individualized consideration of mitigating factors" mandates some type of inquiry. *Lockett v. Ohio*, 438 U.S. 586, 606, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978). In view of the dated nature of parts of the pre-sentence report counsel for petitioner availed himself of the opportunity to cross-examine the probation officer and was afforded the opportunity to present additional evidence in mitigation. Tr. 44 of sentencing hearing conducted on 9 February 1979. In addition the trial judge heard the post-conviction evidence offered in aggravation and mitigation. Counsel called as witnesses for petitioner his parents and his wife. The Court concludes, therefore, that the death sentence was imposed with "the type of individualized consideration of mitigating factors ... required by the Eighth and Fourteenth Amendments in capital cases." *Lockett v. Ohio*, 438 U.S. 586, 606, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978); *see also Eddings v. Oklahoma*, —— U.S. 1, 102 S.Ct. 869, 71 L.Ed.2d —— (1982). For the aforementioned reasons the claim will be dismissed.

### Constitutionality of the Virginia Death Penalty Statute

Next, petitioner claims that the trial court erred in refusing to dismiss the indictments regarding the capital murder offenses for the reasons that they violate the Fifth, Eighth and Fourteenth Amendments of the United States Constitution.

This claim is clearly without merit. The first aggravating factor, under Va.Code § 19.2—264.2,[6] permitting the imposition of the death penalty was approved and held to be constitutional in regard to an identical Texas statute in *Jurek v. Texas*, 428 U.S. 262, 276, 96 S.Ct. 2950, 2958, 49 L.Ed.2d 929 (1976). The second aggravating factor under the Va.Code was held not to be vague and was approved in regard to an identical Georgia statute, in *Gregg v. Georgia*, 428 U.S. 153, 201 n.51, 96 S.Ct. 2909, 2938 n.51, 49 L.Ed.2d 859 (1976);[7] *see also Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). Accordingly, petitioner's claim that the Virginia statute is unconstitutional on its face, will be dismissed.

Next, petitioner claims that the Virginia statute, § 19.2—264.4 is unconstitutional as applied to him. As to this claim, respondent submits and the record indicates that petitioner failed to raise this issue at trial and on appeal. Such failure is a bar to petitioner raising this particular claim in a petition for a writ of habeas corpus. *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). Rule 5:21, Rules of the Supreme Court of Virginia. Under *Wainwright*, however, if petitioner is able to demonstrate "cause" and "prejudice" he may avoid that procedural bar. Petitioner argues that *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), had not been decided by the United States Supreme Court at the time of petitioner's sentencing. Petitioner argues that his rights under *Godfrey* were not known at the time of his sentencing and therefore, the subsequent change of law, constitutes "cause" under *Wainwright*.

This argument is not well taken. As this Court construes *Wainwright v. Sykes, su-*

---

6. Va.Code § 19.2—264.2 provides that:
 In assessing the penalty of any person convicted of an offense for which the death penalty may be imposed, a sentence of death shall not be imposed unless the court or jury shall (1) after consideration of the past criminal record of convictions of the defendant, find that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing serious threat to society or that his conduct in committing the offense for which he stands charged was outrageously or wantonly vile, horrible or inhuman in that it involved tor-

ture, depravity of mind or an aggravated battery to the victim; and (2) recommend that the penalty of death be imposed.

7. Some language in *Godfrey v. Georgia*, 446 U.S. 420, 428–30, 100 S.Ct. 1759, 1764–1766, 64 L.Ed.2d 398 (1980) casts doubt on the clarity which the Supreme Court perceived in identical language used in the jury charge in *Gregg*. On the facts, however, *Godfrey* is distinguished as being a case which the majority viewed as having *no* evidence to support the death penalty.

*pra; Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977) and *Hankerson v. North Carolina*, 432 U.S. 233, 97 S.Ct. 2339, 53 L.Ed.2d 306 (1977), it appears that petitioner is barred from litigating this claim on federal habeas corpus because he failed to except to the alleged error in the jury instruction at trial as required by Virginia Supreme Court Rule 5:21 and he also failed to raise this issue in his appeal to the Virginia Supreme Court. Either of these two failures foreclose either direct or collateral attack on the conviction and are an adequate and separate State ground for denying relief in the instant action. *See Wainwright, supra; Patterson, supra; Hankerson, supra; see also Cole v. Stevenson*, 620 F.2d 1055 (4th Cir. 1980) *cert. denied*, 449 U.S. 1004, 101 S.Ct. 545, 66 L.Ed.2d 301 (1981).

Irrespective of the untimely objection and contrary to the contention of petitioner, his conviction for capital murder is distinguishable from the case of *Godfrey v. Georgia, supra.*

In *Godfrey*, the United States Supreme Court reversed the judgment of the Georgia Supreme Court, which had affirmed two capital murder convictions imposed under identical aggravating circumstance provision of Georgia law. Under that statute, a person convicted of murder could be sentenced to death if it is found beyond a reasonable doubt that the offense was "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." Ga.Code Ann. § 27—2534.1(b)(7). The Supreme Court had previously approved the constitutionality of the Georgia statute on its face. *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). In responding to the argument that the language of the provision was so broad that capital punishment could be imposed in any murder case, the Court said:

> It is, of course, arguable that any murder involves depravity of mind or an aggravated battery. But this language need not be construed in this way, and there is no reason to assume that the

Supreme Court of Georgia will adopt such an openended construction.

428 U.S. at 201, 96 S.Ct. at 2938.

Subsequent to *Gregg*, the Supreme Court analyzed the circumstances in *Godfrey* to ascertain whether the Georgia Supreme Court had adopted a broad and vague construction of the statutory aggravated circumstance provision (§ (b)(7)) as to violate the Eighth and Fourteenth Amendments to the Constitution. The evidence at trial in the *Godfrey* case showed that the defendant, having experienced marital problems with his wife and believing that his mother-in-law was instigating his wife's decision not to consider reconciliation, went to a trailer where his wife, mother-in-law, and daughter were located, shot his wife in the head with a shotgun through a window in the trailer, killing her instantly, and then proceeded into the trailer where, after striking and injuring his fleeing daughter with the barrel of the gun, he shot his mother-in-law in the head, also killing her instantly. After the killings the defendant called the police, acknowledged his responsibility for the crimes, and informed them that he had "done a hideous crime," but that he had been "thinking about it for eight years [and would] do it again."

At trial, Godfrey pled not guilty on two counts of murder and one count of aggravated assault and relied primarily on the defense of temporary insanity. The jury subsequently returned verdicts of guilty on all three offenses.

At the bifurcated sentencing phase of the trial, the trial judge instructed the jury in the statutory language (as had the *Gregg* trial judge, *see Gregg v. Georgia, supra*, at 216–18, 96 S.Ct. at 2945–2946 (White, J., concurring)) and the jury imposed death sentences on both murder convictions, specifying that the aggravating circumstances as to each conviction was that the offense was "outrageously or wantonly vile, horrible and inhuman."

The Georgia Supreme Court affirmed the trial court's judgment in all respects, rejecting petitioner's contention that the statutory provision was unconstitutionally vague

and holding that the evidence supported the jury's findings of the statutory aggravating circumstances. 243 Ga. 302, 253 S.E.2d 710 (1979).

On *certiorari,* the Supreme Court reversed insofar as the Georgia Supreme Court's judgment left standing the death sentences, and remanded the case.

After reviewing its previous decisions in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) and *Gregg v. Georgia, supra,* the Court in *Godfrey* stated:

> This means that if a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty. A part of a State's responsibility in this regard is to define the crimes for which death may be the sentence in a way that obviates 'standardless [sentencing] discretion.' (citations omitted). It must channel the sentencer's discretion by 'clear and objective standards' (citations omitted) that provide 'specific and detailed guidance,' (citations omitted) and that 'make rationally reviewable the process for imposing a sentence of death.' (citations omitted). As was made clear in *Gregg,* a death penalty 'system could have standards so vague that they would fail adequately to channel the sentencing decision patterns of juries with a result that a pattern of arbitrary and capricious sentencing like that found unconstitutional in *Furman* could occur.' (citations omitted).

446 U.S. at 428, 100 S.Ct. at 1764–1765.

The Court went on to state that:

> In the case before us, the Georgia Supreme Court has affirmed the sentence of death based upon no more than a finding that the offense was 'outrageously or wantonly vile, horrible and inhuman.' (citations omitted). There is *nothing* in these few words, standing alone, that ap-

plies any inherent restraint on the arbitrary and capricious infliction of the death sentence. A person of ordinary sensibility could fairly characterize almost every murder as 'outrageously or wantonly vile, horrible and inhuman.' Such a view may, in fact, have been one to which the members of the jury in this case subscribed. If so, their preconceptions were not dispelled by the trial judge's sentencing instructions. These gave the jury no guidance concerning the meaning of any of § (b)(7)'s terms. In fact, the jury's interpretation of § (b)(7) can only be the subject of sheer speculation.

*Id.,* at 428–29,[8] 100 S.Ct. at 1765.

The Court noted that the Georgia Supreme Court had reached two prior distinct but consistent conclusions respecting § (b)(7)'s aggravating circumstances in *Harris v. State,* 237 Ga. 718, 732, 230 S.E.2d 1, 10 (1976) and *Blake v. State,* 239 Ga. 292, 299, 236 S.E.2d 637, 643 (1977). Despite its previous decisions, the Georgia courts did not limit the application of § (b)(7) in *Godfrey.* In *Godfrey,* the defendant did not commit an aggravated battery upon his wife or mother-in-law nor cause either of them to suffer any physical injury prior to their deaths. Additionally, during the trial, the prosecutor informed the jury of this fact and the trial judge indicated such to the appellate court. The circumstances of *Godfrey,* did not, therefore, satisfy the criteria that the Georgia Supreme Court had itself stated in *Harris* and *Blake.*

As has been noted herein, Va.Code § 19.2 —264.4(c) is identical to § (b)(7) of the Georgia statute discussed in *Godfrey.* The facts of the crime here and the charge to the jury here are significantly, and decisively, different.

First, the judge at petitioner's trial instructed the jury that

---

**8.** In *Gregg,* the Supreme Court had rejected petitioner's argument that the very same words in a jury charge were overbroad and vague. The Court, having concluded that the procedures guiding a jury in its determination of whether to impose the death penalty, provided "clear and objective standards so as to produce non-discriminating results," 428 U.S. at 198, 96 S.Ct. at 2937, went on to state that § 27–2534.-1(b)(7), "has not been given a broad reading [by the State court], . . . and there is no reason to think that juries will not be able to understand it." 428 U.S. at 202 n. 54, 96 S.Ct. at 2938 n. 54.

[b]efore the penalty of death can be imposed as punishment in any one or more of these three cases, the Commonwealth must prove beyond a reasonable doubt either one of the following two alternatives: 1. That, after consideration of his past criminal record, there is a probability that he would commit criminal acts of violence that would constitute a continuing threat to society; or 2. That his conduct in committing the offense was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or aggravated battery *beyond that necessary to accomplish an act of murder.*

Tr. 754–55 (emphasis added).[9]

Clearly, this instruction gave the jury adequate guidance in regard to the meaning of § 19.2—264.2's terms. It charges in unmistakable terms the jury's duty to eschew a finding that murder, *qua* murder, is outrageously vile and the like. And the jury unmistakably understood its duty. While finding petitioner's murder of Staples, accompanied by bludgeoning and cutting his throat, to be outrageously vile beyond that necessary to accomplish an act of murder, they specifically rejected this finding with respect to the Hicks and Cooley murders.[10] The jury's careful distinction in its finding indicates that the charge was clear, correct, and, more importantly, understood. Petitioner was not prejudiced by any standardless sentencing by the jury.

Additionally, the instant action can be distinguished from *Godfrey* in that the record before the Court proves that Steven Staples did in fact suffer an aggravated battery and other physical injuries, including torture, prior to his death, thus warranting the capital murder instruction.

Further, at a hearing on the instant petition conducted on 3 February 1982 before this Court, counsel for petitioner was requested to state what instruction should have been given. Counsel replied: "... beyond that necessary to extinguish life under circumstances which indicate heinous depravity of mind and infliction of pain and torture in the process, ..." The Court, upon consideration of this instruction and the one given at petitioner's trial, is unable to distinguish in any constitutionally significant way the suggested language from the actual jury instruction.

Finally, and in any event, the Court is of the opinion that if the challenged instruction does fail to pass constitutional muster, such infirmity is clearly harmless error beyond a reasonable doubt in light of the fact that the jury, with respect to the murder of Steven Staples, also found that after consideration of petitioner's past criminal record, there was a probability that he would commit criminal acts of violence that would constitute a continuing threat to society.[11] *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1979); *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

### Sixth Amendment Right to Counsel

Pursuant to this Court's order dated 26 January 1982, petitioner has filed a supplemental petition for a writ of habeas corpus in which petitioner raises several allegations of ineffectiveness of his trial counsel in violation of his rights under the Sixth Amendment to the United States Constitution.[12] These allegations are as follows:

A) that counsel failed to investigate psychiatric or psychological defenses in the

---

**9.** In view of the criticism of Judge Baker's jury charge set forth in petitioner's brief and at oral argument, it is only fair to say that the trial judge's instructions to the jury on the death penalty were substantially more certain and intelligible than the Supreme Court's instructions to trial judges on that subject.

**10.** The jury did, however, find with respect to the Hicks, Cooley and Staples murders "after consideration of the past criminal record of convictions of the defendant, that there [was] a

probability that the [petitioner] would commit criminal acts of violence that would constitute a continuing threat to society...."

**11.** As set forth earlier in this opinion, this basis for capital punishment passed constitutional muster in *Jurek v. Texas, supra.*

**12.** "In all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defense."

face of evidence that the crimes might well have been perpetrated by someone with a mental disease, defect or condition;

B) that counsel failed to obtain a transcript of the petitioner's preliminary hearing;

C) that counsel failed to move for a change of venue or venire and failed to request sequestration of the jury;

D) that counsel failed adequately to voir dire the jury on the extent of pre-trial publicity, and whether the juror Stokes had infected the other members of the jury by his knowledge of the petitioner;

E) that counsel failed to voir dire the jurors who drove past the scene of the offense during the course of the trial;

F) that counsel failed to voir dire the juror who heard a portion of the broadcast about the trial on the radio;

G) that counsel objected after the close of evidence to a stipulation of evidence with reference to an accomplice which would have allowed counsel more effectively to argue against capital murder and for life imprisonment;

H) that counsel failed to develop an adequate case and to make any argument with reference to mitigation of punishment.

To these claims counsel for the respondent has filed a motion to dismiss stating that petitioner has failed to exhaust available State remedies in accordance with 28 U.S.C. § 2254(b). The Court will address this threshold issue first.

■ Generally, absent a valid excuse, petitioner must first present his habeas corpus claims to State courts. 28 U.S.C. 2254(b). The exhaustion requirement insures that State courts have the first opportunity to review federal constitutional challenges to State convictions and preserves the primary role of State courts in protecting federally guaranteed rights. *Preiser v. Rodriguez,* 411 U.S. 475, 491, 93 S.Ct. 1827, 1837, 36 L.Ed.2d 439 (1973). However, it is abundantly clear that exhaustion of State remedies is not a jurisdictional prerequisite to habeas relief but rather is a matter of federal-State comity. *Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971); *Bowen v. Johnston,* 306 U.S. 19, 27, 59 S.Ct. 442, 446, 83 L.Ed. 455 (1939); *Hewett v. North Carolina,* 415 F.2d 1316, 1320 (4th Cir. 1969). Indeed, this concept is further demonstrated by the fact that a State may waive the exhaustion requirement. *Jenkins v. Fitzberger,* 440 F.2d 1188, 1189 (4th Cir. 1971) (State attorney-general requested federal court to reach merits of petition notwithstanding petitioner's failure to exhaust State remedies where petitioner's claims were meritless).

Though a refusal to require exhaustion is rarely appropriate the reported decisions have preserved a measure of discretion to the habeas court. When a federal judge has had to review, with respect to the exhausted claims, a voluminous and detailed State record, conduct an evidentiary hearing with extensive argument, draft a lengthy opinion, and has had to thoroughly familiarize himself with the case, remand has been held unjustified. *United States ex rel. DiNiro v. Mancusi,* 298 F.Supp. 1294, 1295 n.2 (S.D.N.Y.1969). Under certain circumstances avoidance of delay and piecemeal consideration of the petition has excused exhaustion. *See e.g. United States ex rel. Richardson v. Rundle,* 461 F.2d 860, 864–65 (3d Cir. 1972) *cert. denied,* 410 U.S. 911, 93 S.Ct. 971, 35 L.Ed.2d 273 (1973).

■ A reading of the federal habeas statute itself, 28 U.S.C. § 2254(b) [13] reveals only that a writ of habeas corpus may not be *granted* until State court remedies have been exhausted. It does not offend the policies underlying the exhaustion requirement, or the statute, to *deny* a writ of habeas corpus in a case where State remedies may not have been completely exhausted. Other federal courts when faced with similar situations have adopted this interpretation of the federal habeas corpus stat-

---

**13.** 28 U.S.C. § 2254(b) provides that:
 An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be *grant-*

*ed* unless it appears that the applicant has exhausted the remedies available in the courts of the State.... (emphasis added)

utes and the policies which underlie them. *Commonwealth of Pennsylvania ex rel. Craig v. Maroney*, 348 F.2d 22, 33 (3d Cir. 1965); *In re Ernst's Petition*, 294 F.2d 556, 561–62 (3d Cir. 1961) *cert. denied*, 368 U.S. 917, 82 S.Ct. 198, 7 L.Ed.2d 132 (1961); *United States ex rel. Patrick v. Rundle*, 248 F.Supp. 757, 759 (E.D.Pa.1969); *King v. Beto*, 291 F.Supp. 946, 949–50 (N.D.Tex. 1968); *United States ex rel. Smith v. Nelson*, 275 F.Supp. 261, 268–69 (N.D.Cal.1967); *Lopez v. Pitchess*, 265 F.Supp. 136, 144 (C.D. Cal.1967); *United States ex rel. O'Halloran v. Myers*, 244 F.Supp. 169, 170–71 (E.D.Pa. 1965).

A further factor which the Court must consider is the nature of the case. This is a capital murder case. The death penalty has been imposed. In a non-capital case the thrust of the petitioner is to obtain a hearing in the supposedly more indulgent federal court as quickly as possible. So long as a hearing is delayed he is being punished under his sentence of confinement. In the death penalty case the thrust of the petitioner is directly contrary. So long as a hearing is delayed he is not being punished under his sentence of death. Accordingly, the sensible and rational tactic of the capital petitioner is to use the court's rules and procedures to delay a hearing rather than to use the rules and procedures to advance a hearing.

This difference in premises was brought to the particular attention of the Court in the recent death penalty habeas corpus proceeding styled *James Dyral Briley v. Hutto*, Civil Action No. 81–0231–R. Petitioner had delayed even instituting his federal claim in the district court until the eleventh-hour. Even after entering the federal forum he withheld interposing his ineffective assistance claim until he reached the Court of Appeals. At that time his prior claims had been presented to 29 judges but the tactic won him months, perhaps years, of delay in receiving the punishment adjudged by the trial court. Such tactics should not be furthered by the courts.

Justice Rehnquist identified this consideration in the course of explaining his granting of a stay of execution in *Evans v. Bennett*, 440 U.S. 1301, 99 S.Ct. 1481, 59 L.Ed.2d 756 (1979).

There must come a time, even when so irreversible a penalty as that of death has been imposed upon a particular defendant, that the legal issues in the case have been sufficiently litigated and relitigated so that the law must be allowed to run its course. If the holdings of our Court in *Proffitt v. Florida*, 428 U.S. 242 [96 S.Ct. 2960, 49 L.Ed.2d 913] (1976); *Jurek v. Texas*, 428 U.S. 262 [96 S.Ct. 2950, 49 L.Ed.2d 929] (1976), and *Woodson v. North Carolina*, 428 U.S. 280 [96 S.Ct. 2978, 49 L.Ed.2d 944] (1976) are to be anything but dead letters, capital punishment when imposed pursuant to standards laid down in those cases is constitutional; and when the standards expounded in those cases and in subsequent decisions of this Court bearing on those procedures have been complied with, the State is entitled to carry out the death sentence. Indeed, just as the rule of law entitles a criminal defendant to be surrounded with all the protections which do surround him under our system prior to conviction, during trial and appellate review, the other side of that coin is that when the State has taken all the steps required by that rule of law, its will, as represented by the legislature which authorized the imposition of the death sentence, and the State courts which imposed it and upheld it, should be carried out.

*Id.* at 1303, 99 S.Ct. at 1482–1483.

█ In this case all the considerations which have led courts to deny exhaustion are present. The Court, on the basis of the original petition, had to become completely conversant with the State trial record. The law respecting each of the alleged defaults had to be thoroughly researched. The transcript was studied in its entirety. The nature of the penalty involved would not permit the Court to overlook any arguable defense.

Being mindful of the *Briley* episode, the Court appointed a third lawyer, not associated with the State court trial, to inquire

into and represent petitioner with respect to Sixth Amendment rights. The supplemental petition filed with respect to ineffective representation tracked, in large part, the factual and legal matters, involved in the original petition. The Court could not know, at the time the Commonwealth moved to dismiss for failure to exhaust, whether the petition would be granted. The motion, accordingly, was taken under advisement at the evidentiary hearing. The Court now recognizes that the writ will not be granted.

■ Bearing in mind Justice Rehnquist's *dictum* and for the reasons outlined above, respondent's motion to dismiss based upon petitioner's failure to exhaust claims relating to ineffective assistance of counsel will be denied. The Court's inquiry will therefore turn to consideration of the merits of petitioner's allegations.

In regard to the first basis, (A) above, the Court concludes that there was a complete absence of evidence of any mental defect or disease. Contrary to the assertion of petitioner the facts of the murder were not such that would have, in and of themselves, indicated petitioner's insanity. The crime was wholly rational. The torture and aggravated assault may well have been necessary to coerce Staples into opening the safe. Further, petitioner's post-conviction psychological review indicated that petitioner had demonstrated "no overt evidence of abnormal or unusual thinking." *See* petitioner's Exhibit I. Petitioner, before this Court, exhibited intelligence and coherence. He denied that he had ever been insane. Petitioner's citation to *Wood v. Zahradnick*, 578 F.2d 980 (4th Cir. 1978) and *Springer v. Collins*, 586 F.2d 329, 332–33 (4th Cir. 1978) *cert. denied*, 440 U.S. 923, 99 S.Ct. 1252, 59 L.Ed.2d 477 (1979) are wholly inapposite. Trial counsel had no basis to question their client's sanity in the instant case despite their attentiveness. This claim must therefore, be dismissed.

Next, in (B), petitioner claims that counsel was ineffective in that he failed to obtain a transcript of the preliminary hearing. At a hearing on this petition, petitioner's trial counsel indicated that the courtroom in which petitioner's preliminary hearing was conducted was recently constructed. The court's taping system had not yet been connected though counsel incorrectly assumed that it had.

■ The absence of taping was unfortunate, though it was not reasonably to have been anticipated. Not every omission or error on the part of counsel indicates ineffective assistance. *Marzullo v. Maryland*, 561 F.2d 540, 544 (4th Cir. 1977) *cert. denied*, 435 U.S. 1011, 98 S.Ct. 1885, 56 L.Ed.2d 394 (1978); *Via v. Superintendent*, 643 F.2d 167, 171 (4th Cir. 1981). Even if it were unreasonable for counsel to have failed specifically to check the functioning of a taping system, the uncontradicted testimony of Mr. Englisby indicated that his notes and recollection were a sufficient basis for him to say with assurance that the absence of a preliminary hearing transcript at the trial did not hamper him in his examination of the witnesses. Accordingly, this claim for relief will be dismissed.

Next, at (C), petitioner claims that counsel was ineffective in that counsel failed in the face of publicity to move for a change of venue or venire and failed to request the sequestration of the jury.

The main purpose of a motion for a change of venue or for a change of venire is to obtain an unbiased jury. There is no evidence or suggestion that the court was unable to obtain an unbiased jury. The test in determining whether a jury is impermissibly biased was stated in *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). The Court stated:

> It is not required, however, that the juror be totally ignorant of the facts and issues involved. These days of swift, widespread and diverse methods of communication, an important case can be expected to arouse interest of the public in a vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in a criminal case. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an

accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality which would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

366 U.S. at 722–23, 81 S.Ct. at 1642–1643. Additionally, the trial court adequately questioned the jury on their knowledge of the case and their impartiality. Tr. 9–10, 20–29, 39–40. The venire was also asked if there was any reason why any of them could not give the petitioner and the Commonwealth a fair trial. Tr. 42. The Court is of the opinion that the jury was a qualified jury under the *Irvin v. Dowd* test and that counsel was not ineffective for their failure to make a motion for a change of venue or venire.

Further, counsel testified at the hearing on this petition that counsel felt it was better not to call greater attention to the trial by a venue change motion. Counsel also stated that they did not wish to delay the trial. Counsel noted that at the time of the decision not to move for a change of venue or venire, the Commonwealth had a relatively weak circumstantial case which was still under investigation. Any delay might well have afforded the Commonwealth the time and the opportunity to uncover additional evidence to strengthen her case. Such sound trial tactics are not to be second guessed by this Court. *Goodson v. United States*, 564 F.2d 1071, 1072 (4th Cir. 1977).

With respect to failure to make a motion for sequestration of the jury, the decision was made within the context of trial tactics which would emphasize that the defendant had nothing to hide, that he did not dispute the facts of the case other than his participation, that he was wholly open about the matter, that he had cooperated with police and that he didn't wish to appear to be afraid of the jury knowing everything it wanted to know about the case. Under such circumstances, a searching and intense voir dire and requirement of sequestration would have raised an aura wholly contrary to the character of defendant's choice of trial tactics.

Next, at (D), petitioner claims that counsel failed adequately to voir dire the jury on the extent of pre-trial publicity, and to inquire whether the juror Stokes had infected the other members of the jury by his knowledge of the petitioner. The issue of adequate voir dire in regard to pre-trial publicity was dealt with above. In regard to the juror Stokes, the voir dire as a whole required the jurors to answer in the negative whether any had been spoken to about the case and whether they had formed any opinion. Thus, whether Stokes talked with any member of the venire and whether they had been infected by his prejudice, favorable or unfavorable, was inquired into. Counsel chose to have the inquiry conducted in the least obtrusive way in view of the persona which defendant, through his counsel, had chosen to present.

Next, point (E), petitioner claims that counsel failed to voir dire the juror who drove past the scene of the offense during the course of the trial. There is simply no showing as to how this could have prejudiced the jury. To the contrary, this omission to inquire was in line with adopted trial tactics for counsel to appear completely unconcerned with a view of the premises. In any event, the record indicates that the judge did in fact conduct a voir dire on this particular issue. Tr. 543. An intensive voir dire on such a relatively insignificant point could well have been disadvantageous.

Petitioner, point (F), next claims that counsel failed to voir dire the juror who heard a portion of a news broadcast about the trial on the radio. At the evidentiary hearing on the petition Mr. Barnes stated several reasons for not conducting an obtrusive voir dire on this point. He stated that he had reason to believe that he had heard the same radio broadcast in its entirety and that, in his opinion, it contained nothing harmful. Rather than induce the jury, through questioning, to wonder what the defendant was hiding, counsel's continued tactic, pursued even before this Court at the habeas evidentiary hearing, was that

petitioner had nothing to hide. Further, the trial court questioned the juror in regard to the radio broadcast and the following colloquy took place:

JUROR: In one instance, before I could get the radio turned off, there were a few words said.

THE COURT: Then you cut it off?

JUROR: I cut it off.

THE COURT: Mr. Curle, would that effect [sic] your judgment in this case in any way whatsoever?

JUROR: In my opinion, no, Sir.

THE COURT: Does anybody want to interrogate Mr. Curle?

MR. BARNES: No, Sir. I have no problem with that.

THE COURT: All right, Sir.

Tr. 542. The Court is of the opinion, that under these circumstances counsel did not need to further voir dire the juror.

Next, at (G), petitioner claims that counsel was ineffective in that he failed to object after the close of the evidence to a stipulation with reference to the existence of an accomplice. Such a stipulation would have given counsel a different factual basis to argue against conviction as well as against capital punishment. The Court will review this issue in regard to each of the four stages of petitioner's trial where the issue arose or could have arisen.

**1. Pre-trial:**

It was counsel's trial tactic that all forms of reference to an accomplice should be excluded from petitioner's trial. A motion in limine to this end was filed. Counsel based this decision upon the idea that any evidence of the existence of an accomplice would add to the Commonwealth's circumstantial case. It would help explain the absence of petitioner's fingerprints and footprints at the crime scene. The fact that Bowling, the accomplice, was with petitioner at the time the police stopped petitioner on the evening of the crime would add to the detrimental effect of such evidence. The Court is of the opinion that this decision was reasonable trial tactic not based on neglect or ignorance but on thought, experience, and concern.

**2. After the close of the evidence:**

Consistent with the instruction of defendant, i.e., liberty or death, petitioner's trial counsel was of the opinion that the knowledge of the existence of an accomplice would impair the effectiveness of the "negative" evidence of no fingerprints or footprints placing defendant at the scene of the crime. All of the Commonwealth's evidence pointed circumstantially to petitioner's presence and his guilt, save for the fact that there were numerous fingerprints and one clear footprint, none of which were petitioner's. Thus, counsel was able to contrast the circumstantial evidence with the complete—and unexplained—absence of direct evidence. If the jury be permitted to learn that there was an accomplice then this contrast could no longer effectively be made. In other words, the presence of an accomplice would explain away one of the possible arguments that defendant intended to use, and did in fact use, in his plea for a not guilty verdict.

**3. The jury sentencing stage:**

Faced now no longer with a choice between acquittal or the death penalty, but only with life imprisonment or the death penalty, counsel testified that he thought consistency was a better gamble. Counsel believed that a jury would be disinclined to impose the death penalty solely on the basis of circumstantial evidence. Counsel therefore remained with their argument made at the verdict stage hoping that even though it failed to implant a reasonable doubt as to guilt, it afforded them the best opportunity to implant a shadow of a doubt so as to save their client from the electric chair. Though this tactic may in hindsight be faulty, it clearly does not fall below the Marzullo standard. It can only be faulted in the sense that the tactic adopted did not succeed and that the introduction of evidence of an accomplice might have been successful. But on this we can only speculate, particularly in light of the fact that the

record in the accomplice's case contains his assertion that it was petitioner's finger that fired the fatal shots.

### 4. Sentencing stage before the judge :

At the evidentiary hearing on the petition, the Court and all counsel, erroneously and inexplicably, appeared to have assumed that Bowling, the accomplice, was not alluded to by counsel at the sentencing hearing before the judge. Nothing could be further from the truth. In the typed transcript of the sentencing proceeding 19 of 50 pages, almost 40%, were devoted wholly or in part to the accomplice problem in the context of a motion to set aside the verdict. Further, the trial judge made the entire Bowling transcript part of the record and Bowling's participation in the crime was part of the information submitted to the judge in Stamper's pre-sentence report. The failure then of counsel in respect to the accomplice at this stage was not a failure to bring the facts to the Court's attention, but instead, a failure to bring the facts to the Court's attention in the particular context of the sentence.

The accomplice issue was argued vigorously on the motion to set aside the verdict. Its logic was equally applicable to the sentence. While the judge specifically noted that no evidence of an accomplice was before the jury, he made it abundantly clear that such knowledge was in the mind of the Court at the time of the sentencing. Under such circumstances, counsel's failure to argue and articulate that which was known to and was obviously in the mind of the judge can not be said to be prejudicial to petitioner.

Though in the supplemental petition only stage two (2), above, was specifically stated as a ground for issuing the writ, the other three stages were inquired into at the evidentiary hearing and have thus been considered by the Court.

Petitioner, at (H), complained of a failure of counsel to present an adequate case at the mitigation stages. Specifically, he alleges that the failure of counsel to summons a Mrs. Dobbs, a potential witness at the mitigation stage, constituted ineffective assistance. The evidence at the hearing on the petition, showed that Mrs. Dobbs was in fact contacted and that she responded that a heart ailment precluded her attendance at petitioner's trial.

Petitioner also claimed that the failure to call his brothers and sisters in mitigation proves the ineffectiveness of counsel. Counsel testified, however, that petitioner's mother and father and wife were called at the mitigation stage and that the testimony of petitioner's brothers and sisters would have been merely cumulative. Counsel deemed it unnecessary to present the jury with a parade of unquestionably biased witnesses. Further, the evidence showed that counsel inquired of petitioner well before trial who his mitigation witnesses might be. He did not suggest his siblings.

Next, although also not raised in the supplemental petition petitioner testified that counsel only visited him two to three times prior to the trial. Counsel testified, however, that they visited petitioner four to seven times. These visits represented only a small portion of the total time spent with defendant in person and on the telephone. The uncontradicted evidence showed relatively unrestrained telephone access, conferences before and after the various hearings, and correspondence by mail. There is no indication that counsel's communication with the petitioner was in any way inadequate.

The Court now turns to the question of prejudice to petitioner. The very nature of trial tactic decisions requires a weighing of the potential benefits and potential prejudices which may inure to the defendant. Accordingly, where it is argued, as it is here, that the tactics adopted were less advantageous than other possible choices, then a petitioner must assume the burden of showing the infirmity of the choice and the consequent detriment to his case. By the very nature of the allegation, petitioner

could not show its existence without showing the prejudice to him.

Accordingly, in such a bad choice of tactics case, the Court does not have to resolve the question of whether prejudice need be shown and who has the burden.[14] If a petitioner cannot show prejudice, he perforce cannot show, even arguably, a poor tactical choice. Thus, the nature of the beast requires that petitioner allege and prove prejudice.

 In each of the tactical choices complained of petitioner has shown that a different choice *might* have resulted in a more favorable outcome for him. The maximum punishment having been imposed, any argument as to the comparative benefit of the choices actually made would be conjectural. It has to be recognized that the very best of lawyers, as well as the very best of judges, sometimes err. The Sixth Amendment does not require error free lawyers any more than the Fifth and Fourteenth Amendments require error free trials. In adopting the language of *McMann v. Richardson*, 397 U.S. 759, 771, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763 (1970), the Fourth Circuit cautioned that counsel's decisions are not to be judged by retrospectively considering them to be right or wrong. *Marzullo v. Maryland*, 561 F.2d 540, 544 (4th Cir. 1977) *cert. denied*, 435 U.S. 1011, 98 S.Ct. 1885, 56 L.Ed.2d 394 (1978). Instead, the proper standard is "whether the advice was within the range of competence demanded of attorneys in criminal cases." The Court recognized that "effective representation is not the same as errorless representation." Rather, a petitioner "must establish that his counsel's error was so flagrant that a Court can conclude it resulted from neglect or ignorance rather than from informed, professional deliberation." *Id.*

This Court is of the opinion that no aspect of petitioner's trial counsels' representation fell below the *Marzullo* standard. Instead, the Court concludes from an extensive study of the record and transcript, the evidence adduced at the evidentiary hearing on the petition, the argument and briefs of counsel and the Court's own experience as a trial lawyer that, far from receiving ineffective assistance of counsel, petitioner received exemplary representation by counsel. That the trial may not have been error free and that counsels' performance is subject to second-guessing merely demonstrates that counsel had some difficult decisions to make.

For the reasons stated above, the petition for a writ of habeas corpus will be DENIED.

On 26 January 1982, the Court stayed execution of petitioner's sentence of death, pursuant to 28 U.S.C. § 2251, pending resolution of the instant petition. In light of the Court's disposition on the petition, the stay of execution shall expire thirty-one days from the entry hereof. This affords petitioner the statutory time to note his appeal if he be so advised.

---

14. The Supreme Court's position regarding whether prejudice is inherent in a Sixth Amendment violation or must be proven as an additional element has not been consistent. *Compare Glasser v. United States*, 315 U.S. 60, 76, 62 S.Ct. 457, 467, 86 L.Ed. 680 (1941) (right to effective assistance of counsel too important to permit trial court "to indulge in nice calculations as to the amount of prejudice" attributable to conflict) with *United States v. Morrison*, 449 U.S. 361, 365, 101 S.Ct. 665, 668, 66 L.Ed.2d 564 (1981) (assuming constitutional violation has occurred, defendant also must show prejudice to receive remedy). The extent of the violation and the source of the violation, that is, the government intrusion or the ineffectiveness of counsel, may explain the different approaches to the prejudice requirement.