## Richmond

TERRY LEE SIMMONS

V.

COMMONWEALTH OF VIRGINIA

March 11, 1983.

Record No. 820670.

Present: Carrico, C.J., Cochran, Poff, Compton, Thompson,*
Stephenson and Russell, JJ.

---

\* Justice Thompson participated in the hearing and decision of this case prior to the effective date of his retirement on March 2, 1983.

112

*Jonathan C. Thacher; James J. Harney (Robert B. Machen,* on brief), for appellant.
*Donald R. Curry, Assistant Attorney General (Gerald L. Baliles, Attorney General,* on brief), for appellee.

COMPTON, J., delivered the opinion of the Court.

The broad question in this criminal appeal is whether the conviction is constitutionally valid. Specifically, the issues relate to legality of the seizure of defendant's person, admissibility of defendant's confessions to police, and existence of harmless error.

Indicted under Code § 18.2-32 for the murder of Caroline Hui Yoo, defendant Terry Lee Simmons, a career soldier, was found guilty by a jury of murder of the second degree. Punishment was fixed at 20 years' imprisonment. The trial court confirmed the verdict and sentenced defendant accordingly. Simmons appeals the December 1981 judgment of conviction.

I

On Sunday, August 16, 1981, about 7:00 p.m., the decomposing body of Caroline Yoo, a Korean, age 29, was found by police lying in a closet in an apartment in Fairfax County. The body was covered with a blanket. The police had been called by the apartment resident manager who discovered the body as a result of complaints by tenants that stench and flies were emanating from the apartment. About six hours later the body of Julia Yoo Simmons, age three months, was found in a plastic bag in "the deeper part" of the closet. Subsequent investigation disclosed the deaths occurred on June 19, 1981. The infant died from a skull fracture; Caroline's death resulted from strangulation by ligature.

The apartment had been occupied since February 1, 1981 by Caroline (hereinafter sometimes referred to as the victim) and defendant, a 27-year-old Army sergeant attached to a unit at Fort Myer. He was stationed in the Army Operations Center at the Pentagon. In a job requiring a person with a high IQ, defendant performed responsible and sensitive duties as Controller of Secret Documents. He was a high school graduate and had taken college-level courses.

The couple's child, Julia, was born in March. Subsequently, the relationship between defendant and the victim began to deteriorate. Just prior to June 19, Simmons told a co-worker that he "wanted rid of [Caroline]." Shortly after June 19, defendant told fellow soldiers that "he had taken care of the problem" saying, " 'I got rid of the bitch. She's gone for good.' " According to one of defendant's Army associates, who visited Simmons about August 26 in the Fairfax County jail, defendant said he had killed the victim but not the baby. Simmons indicated that when he arrived at the apartment on the day in question, he found the dead infant; Caroline was not present at the time and, when she arrived, Simmons killed her because she had killed their child.

When the bodies were discovered, numerous room fresheners and moth balls were in and around the closet. One of the fresheners was found on the victim's body. Identification cards and clothing bearing defendant's name were also found by the police on the premises. A latent fingerprint on one of the air fresheners was identical to Simmons' right thumb print. Shortly after June 19, defendant gave a neighbor a quantity of baby clothes, saying the mother and child "had gone home on the bus." On June 20, defendant gave the child's crib to his sister, living in

Maryland at the time, and told her that Caroline and the baby "had gone back to Korea."

## II

### A

The following evidence bearing on the seizure and confession issues was adduced during a pre-trial hearing, and at the trial. In the course of both proceedings, defendant moved to suppress the confessions and attacked the validity of his seizure.

At about 8:00 p.m. on August 16, the day the victim's body was discovered, Fairfax County Police Investigator Mullins determined from military authorities that Simmons was on authorized leave, due back to resume work at the Pentagon on August 18. Upon later determining that defendant failed to return from leave, Mullins learned Simmons was at a woman's residence in Tallahassee, Florida. During the afternoon of August 18, Mullins telephoned the residence and a male answered. Mullins said, "Is this Terry Simmons?" The male responded "no" and the telephone was hung up. Mullins called again. A female answered. Mullins asked for "Terry Simmons." The male returned to the telephone. Mullins informed him who was calling, said that two bodies had been found in Simmons' apartment, and asked defendant if he knew their identity. Defendant responded, " 'They're Caroline Yoo and Julie.' " The telephone line then went dead, according to Mullins.

Testifying at trial, defendant stated, in support of a voluntary manslaughter defense, that he probably killed Caroline in a heat of passion because she had killed their daughter, to whom he was devoted. He testified that he spent about five nights in the apartment after the homicides. Later, he placed air fresheners in the premises and from time to time thereafter returned to the apartment. On August 17, while on leave, he came to the premises and saw a "seal" on the door stating, "Police Crime Scene." He testified he panicked, got into his automobile, and started to drive. About 12 hours later, he "ended up" at the Tallahassee home of a girl friend.

The next day, immediately after conversing with Mullins on the telephone, defendant acquired a shotgun and shells with the intention of committing suicide. He then "started driving around, . . . end[ing] up in Georgia someplace." He remained "out in the

woods" for almost two days, contemplating suicide but was unable to perform the act. Then be began driving and "ended up" about 1:30 p.m. on Thursday, August 20, at the military police (MP) station, Fort Benning, Georgia.

In the suppression hearing, defendant testified he went to Ft. Benning for the purpose of surrendering because he was absent without leave (AWOL). At the time, he said, he had an "indication" from Mullins' calls that law enforcement officers were seeking to interrogate him in reference to a Virginia crime "that may have occurred." Defendant told the sergeant on duty at the MP station that he was surrendering for being one day AWOL. Defendant testified he was "subsequently released." Immediately, according to defendant, he told the sergeant he "believed there might be warrants out for [his] arrest in Fairfax County, Virginia."

Upon orders from the MP in the presence of an Army captain, Simmons surrendered his military identification card and was escorted by "AWOL detainees [sic]," MPs, to a "detentionary." The place of detention was inside a "secure compound" with fences, barbed wire, and an electric gate. Also inside the detention compound were "detainees barracks," according to defendant, who was the only witness called to testify during the suppression hearing.

When arriving at the compound, defendant said, he was taken to the office of a Staff Sergeant Kelly, "the AWOL apprehension sergeant." During the afternoon while Simmons was detained in Kelly's office, the military authorities attempted to verify defendant's AWOL status by calling, first, the Pentagon and, then, Ft. Myer. They also tried to verify the fact Simmons was wanted by Virginia authorities by calling Fairfax County police at 2:30 p.m. In that period, the Ft. Benning MPs learned there was a shotgun in defendant's automobile, and defendant told them he had considered suicide.

During one of Kelly's telephone conversations, at a time unspecified in the record, Kelly left the phone and warned defendant of his rights as required by *Miranda* v. *Arizona,* 384 U.S. 436 (1966). Defendant testified he responded that he did not want to make a statement and that, "He asked me if I wanted an attorney and I said yes." According to defendant, he was taken to "a detention cell," about 4:30 p.m. where he remained until about

12:30 a.m. the next day, August 21, when he first met Investigator Mullins, who had arrived from Fairfax County.

Mullins interviewed defendant in the presence of a Major Tenhett at MP Headquarters. Stating he was conducting a murder investigation, Mullins warned defendant prior to the discussion according to *Miranda*. At 12:44 a.m., Simmons read and signed a waiver of rights form, labelled "Warning and Consent." The form contains the following statements:

"1.  I have the right to remain silent. I am not required to say anything to anyone at any time or to answer any questions.

"2.  Anything I do or say can and will be used against me in a court of law.

"3.  I have the right to talk to a lawyer before being questioned and I also have the right to have the lawyer with me while being questioned.

"4.  If I cannot afford a lawyer, and want one, one will be provided for me.

"5.  If a I want to answer questions now without a lawyer present, I will still have the right to stop answering questions at any time. I also have the right to stop answering questions at any time if I want to talk to a lawyer.

\* \* \*

"I know what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer. I understand and know what I am doing. No promises or threats have been made to me by anyone."

Simmons then made an oral confession about the crimes during the discussion with the officers, which terminated about 3:00 a.m. Next, he was returned to confinement.

Subsequently, at 11:30 a.m. on that day, in the presence of Tenhett, Kelly, and another Army officer, Mullins again informed defendant of his *Miranda* rights. Simmons read and signed a second waiver form, identical to the first. Mullins, using a tape recorder, then took a question-and-answer statement from defendant. Simmons gave the same account of the events surrounding the homicides as he had given earlier in the day. At no time was Mullins made aware of defendant's earlier request for counsel.

According to the transcript of the taped interview, defendant arrived at the apartment from his duty station about 5:00 p.m., on Friday, June 19. Caroline arrived "a while later without the baby." When defendant "asked her where Julie was," she said, " 'Heaven.' " The mother, on prior occasions, had threatened to kill the child because she was "ashamed of the baby." About 6:00 p.m., he discovered the baby, dead in her crib under blankets. Defendant stated he killed Caroline by choking her with a rope. He then placed both bodies in the closet, according to the confession.

Later in the day on August 21, defendant waived extradition and was returned to Fairfax County, where he was served on August 22 with an arrest warrant for the murder of Caroline. Subsequently, defendant was indicted for the murders of both mother and child. At the conclusion of all the evidence at trial, the court sustained defendant's motion to strike the Commonwealth's evidence on the count relating to the infant's homicide.

## B

Defendant argues the trial court erred in denying his motion to suppress the confessions because they resulted from an illegal seizure of his person in violation of defendant's rights under the Fourth and Fourteenth Amendments. He notes that confessions which are the product of illegal police action should be excluded under the doctrine of *Wong Sun* v. *United States,* 371 U.S. 471 (1963), and its progeny.

Defendant contends that when he voluntarily surrendered for being *one* day AWOL, he "was told to leave and report to his unit." He asserts he was detained, handcuffed, and escorted to solitary confinement "at that juncture" upon the request of Fairfax authorities. He urges the police acted "under no color of authority in that [Simmons] was not under military arrest, nor had either a military confinement order been issued or an arrest warrant from Fairfax County." He argues that he "was held at the oral request" of Mullins who desired to interrogate him, and that "[o]nly after [Simmons] had been interrogated twice did the investigator obtain an arrest warrant." Thus, he says, despite the evidence of repeated *Miranda* warnings, the Commonwealth failed to carry the burden to show the confessions were not induced by exploitation of the unlawful seizure, citing *Dunaway* v. *New York,* 442 U.S. 200 (1979), and *Brown* v. *Illinois,* 422 U.S. 590 (1975). *See Hart* v. *Commonwealth,* 221 Va. 283, 269 S.E.2d

806 (1980); *Reese* v. *Commonwealth,* 220 Va. 1035, 265 S.E.2d 746 (1980).

We reject this argument. The defendant has misinterpreted the facts and misreads the applicable military law. In the first place, when the evidence is viewed in the light most favorable to the Commonwealth, as it must be under these circumstances, at all times after Simmons surrendered to the Ft. Benning MPs at 1:30 p.m. on August 20, he was in the lawful custody of the Army authorities. Initially, when defendant surrendered, he was the subject of a military "apprehension" within the meaning of the Uniform Code of Military Justice, 10 U.S.C. §§ 801-940 (hereinafter UCMJ). Simmons was absent without leave in violation of Article 86(3), UCMJ, thus committing an offense under the Code. Any person subject to the UCMJ may be apprehended by authorized military personnel "upon reasonable belief that an offense has been committed and that the person apprehended committed it." Art. 7(b), UCMJ. "Apprehension is the taking of a person into custody." Art. 7(a), *id.* Thus, when Simmons, who had been AWOL for two days, not one as he claimed, surrendered to the MPs, he was properly taken into custody.

But, defendant states on brief he was then told "to leave and report to his unit." The record does not support that factual conclusion. He merely testified he was "released." The trial judge was not bound to believe that statement. Indeed, defendant's other testimony supports a contrary conclusion which the trial judge could properly reach, that is, defendant was held in continuous custody, at least in part, because he was AWOL.

According to defendant, he was relieved of his military identification card, turned over to the MPs as an *AWOL* detainee, taken where there were "detainees barracks," and then ushered into the office of Kelly, "the AWOL apprehension sergeant." During the next several hours, while defendant was still subject to military "apprehension," the Army sought to verify his AWOL status. In the same period, the military authorities learned defendant, who had access to highly classified documents, was wanted in Fairfax County, that he possessed a shotgun, and that he was suicidal. Thereafter, at 4:30 p.m., defendant was placed in military "confinement," defined as "the physical restraint of a person." Art. 9(a), UCMJ.

Defendant contends he could not have been held in confinement for military purposes, under the evidence, because a written order

is required for such restraint and there is no evidence of such a writing. Thus, he suggests, the confinement was on a pretext at the request of Fairfax authorities to enable Mullins to question him. Defendant has overlooked the provision of the UCMJ which permits confinement, as here, by an oral order, Art. 9(b), upon probable cause, Art. 9(d). Given the information accumulated about Simmons during the afternoon of August 20, we cannot say the trial court erred in implicitly finding defendant lawfully was held for military purposes during the entire period from the time of his surrender through the time the taped confession was made on August 21. Thus, there was no unlawful seizure of defendant's person and no Fourth Amendment violation.

## C

■ Relying on *Edwards* v. *Arizona,* 451 U.S. 477 (1981), defendant contends the trial court erred in failing to suppress the confessions made during custodial interrogation because they were made without a knowing, intelligent waiver of the right to counsel. He argues he "clearly indicated" to the MPs that he wanted counsel before answering any questions, that none was provided, and that the interrogation initiated by Mullins without an attorney present representing the accused was unlawful. We do not agree.

In *McFadden* v. *Commonwealth,* 225 Va. 103, 300 S.E.2d 924 (1983), decided today, we make a detailed analysis of *Edwards.* Here, it is sufficient to say that *Edwards* deals with the Fifth and Fourteenth Amendment right of an accused to have counsel present during custodial interrogation. Under *Edwards,* and *Miranda,* a waiver of counsel must be voluntary and constitute an intelligent relinquishment of a known right or privilege. 451 U.S. at 482. In *Edwards,* the accused made inculpatory statements after he was told by the authorities "he had" to talk to colleagues of the officer who previously had questioned him about the same crime and to whom defendant previously had made a request for counsel. The Supreme Court held that when an accused has invoked the right to have counsel present during such custodial interrogation, a valid waiver of that right cannot be established by proof only that defendant responded to further police-initiated custodial interrogation. Under *Edwards,* once the accused expresses a desire to deal with the police only through counsel, he is not subject to further questioning by the authorities until an attorney has been

made available to him, unless the defendant himself initiates further discussion with the police. 451 U.S. at 484-85.

█ But *Edwards* does not control here. In *Edwards,* the accused was interrogated again about the same crime, with the second questioning initiated by associates of the same officers to whom Edwards previously made his request for an attorney. In the present case, as in *McFadden,* the crimes and authorities were different. Simmons was read his *Miranda* warnings by Kelly, a military policeman, during the course of Kelly's continuing effort to verify defendant's status with reference to the military law. The challenged confessions were made on other occasions after explicit written waivers were executed by defendant, to Mullins, who was not told by anyone, including defendant, that he previously had asked for counsel. More importantly, Mullins, a civilian law enforcement officer, interrogated Simmons, not about military violations, but with regard to State crimes. Consequently, we hold Mullins properly initiated questioning of Simmons because defendant did not invoke his right to have an attorney present during those periods of custodial interrogation. *McFadden* v. *Commonwealth, supra.* We also conclude the confessions were voluntary, made after knowing, intelligent waivers of the right to counsel.

### III

█ While maintaining the trial court properly received the confessions in evidence, the Attorney General argues, alternatively, that any error in reception of the admittedly voluntary statements was harmless beyond a reasonable doubt, because the evidence dehors the confessions conclusively establishes defendant's guilt.

We agree. In *Pearson* v. *Commonwealth,* 221 Va. 936, 944-45, 275 S.E.2d 893, 899 (1981), relying on *Chapman* v. *California,* 386 U.S. 18 (1967), and *Milton* v. *Wainwright,* 407 U.S. 371 (1972), we applied the harmless error doctrine on review of an appeal in which there was a voluntary confession but which involved Fifth and Sixth Amendment violations. In similar fashion, we apply the doctrine here.

The factual summary contained in Part I of this opinion is based entirely on evidence apart from the confessions and defendant's trial testimony. Such evidence alone establishes that Simmons killed the victim on the day in question with malice. Indeed, it tends also to prove that defendant committed a willful, deliber-

ate, premeditated act, sufficient to support a first degree murder conviction. The jury reasonably could have inferred from the evidence, including the statement defendant made to the Army associate while in the Fairfax jail on August 26, that Simmons found the child dead when he returned to the apartment, laid in wait for the victim, and deliberately killed her when she arrived home. At the very least, though, ignoring all evidence which may have been suppressed, we conclude the Commonwealth discharged its evidentiary burden to establish that Simmons was guilty of murder of the second degree; any error below was harmless beyond a reasonable doubt.

For all of these reasons, the judgment of conviction will be

*Affirmed.*