## Richmond

### Timothy Dale Bunch

### v.

### Commonwealth of Virginia

June 17, 1983.

Record No. 822081.

Present: Carrico, C.J., Cochran, Poff, Compton, Stephenson, and Russell, JJ., and Harrison, Retired Justice.

*Richard H. Boatwright; Lloyd D. Hinrichs (Stephens, Boatwright & Howard*, on brief), for appellant.

*Jerry P. Slonaker, Assistant Attorney General (Gerald L. Baliles, Attorney General*, on brief), for appellee.

CARRICO, C.J., delivered the opinion of the Court.

Indicted for capital murder in the commission of robbery while armed with a deadly weapon, Code § 18.2-31(d), Timothy Dale Bunch was tried by a jury and found guilty as charged. In the sentencing phase of the bifurcated proceeding, the jury fixed Bunch's punishment at death. After receipt of a pre-sentence report, the trial court confirmed the jury's verdict and imposed the death penalty. Bunch is here for automatic review of his death sentence. This review has been consolidated with Bunch's appeal from his conviction, and the matter has been given priority on our docket. Bunch seeks, alternatively, a new trial on a non-capital offense, a new trial on the capital charge, or commutation of his death sentence.

The record shows that in the months of December, 1981, and January and February, 1982, Bunch, a sergeant in the United States Marine Corps, was detached from duty in Japan and assigned to temporary duty at Quantico in Prince William County. During this period, he met Su Cha Thomas, a divorced woman living alone in Dale City near Quantico, and an intimate relationship developed between them. At the time, Bunch was separated from his wife.

On February 2, after Thomas had failed to report for work, Prince William County police went to her home and found her body hanging from a door knob by a scarf tied around her neck. An autopsy revealed a gunshot wound to the head and "congestion of the blood [vessels] within the lungs." The medical examiner concluded "this was a combined cause of death due to a gunshot wound to the head . . . with a secondary complication, asphyxiation by hanging."

One of the items missing from Thomas's home was a lady's Rolex wristwatch. On the day Thomas's body was discovered, Bunch sold a similar watch to an Arlington County pawn shop. A report filed by the pawn shop with the police, as well as other information, led investigators to Bunch, who had returned to his permanent duty station in Japan.

Bunch was interrogated in Japan on February 16 by Donald L. Cahill, a Prince William County police investigator who had journeyed to Japan with warrants charging Bunch with the robbery and murder of Thomas. In the course of the interrogation, Bunch made certain incriminating statements to Cahill. Bunch was re-

turned to the United States, and, upon his arrival in Prince William County on February 21, made a statement to Cahill admitting he had killed Thomas on January 31 and had taken her Rolex watch, a diamond ring, a string of pearls, and other items of jewelry. Bunch stated he killed Thomas because "she was a slut and she reminded him too much of his wife and he wanted her money."

## I. Pretrial Proceedings

### a. Suppression of Confession.

In a pretrial motion, Bunch sought to suppress the confession he made to Investigator Cahill on February 21, following his return to Prince William County from Japan. In the motion, Bunch claimed that he gave the confession after his earlier "requests for counsel had been unfulfilled." Finding that Bunch had requested and been denied the assistance of counsel in Japan, the trial court suppressed the incriminating statements made there by Bunch. The court refused, however, to suppress the confession Bunch gave to Investigator Cahill on February 21 in Prince William County. Bunch contends this refusal was error.

The record shows that Investigator Cahill was accompanied to Japan by William Hamblen, an assistant Commonwealth's attorney for Prince William County. Upon their arrival at Bunch's duty station at Iwakuni, Bunch was brought to Naval Intelligence Service Headquarters by military police. He was placed in a room with Cahill and Hamblen, and Cahill read him his rights under *Miranda* v. *Arizona*, 384 U.S. 436 (1966). Bunch signed a "Warning and Consent" form and indicated he was willing to talk. Cahill then began to interrogate him.

According to Bunch's testimony at the suppression hearing, he asked to consult counsel "approximately a dozen times" during the interrogation at Iwakuni. Cahill and Hamblen denied Bunch made any outright request for counsel, but claimed he stated once, after the interrogation had continued for some time, that "he felt like he might want to talk to a lawyer." When this statement was made, Hamblen left the room and Cahill talked to Bunch on another matter an additional several minutes. Then, as Cahill was leaving the room to ask Hamblen whether the interrogation should continue in light of Bunch's statement concerning counsel, Bunch stated he would cooperate. He told Cahill that "the gun" was at his mother's home in Indiana and that "the ring" was in Japan.

Cahill and Hamblen decided Bunch should not be interrogated further unless he signed another "Warning and Consent" form. When a new form was presented to him, Bunch refused to sign it, and the interview was terminated.

In the custody of military personnel, Bunch was transported by plane from Japan to Dulles Airport in northern Virginia and by automobile from Dulles to Quantico, the trip consuming some forty-two hours. Although he was not questioned during the trip about Thomas's murder, military personnel escorting Bunch advised him of his *Miranda* rights on the flight from Los Angeles to Dulles. Upon arrival in Quantico after midnight on February 21, Bunch was processed for delivery to Prince William County authorities.

As a part of this process, Bunch consulted with Major Donald R. Jillisky, a lawyer attached to the Marine Judge Advocate General's Office. The major told Bunch that he was "a Marine Corps lawyer . . . not his lawyer" and that it was his, the major's purpose "to inform [Bunch] of what his situation was and to surrender him to State authorities." Jillisky informed Bunch of the charges against him and told him he would be required to hire his own lawyer or secure court-appointed counsel. Jillisky advised Bunch that "he did not have to say anything until he consulted with his lawyer, and that it was probably not in his best interest to say anything until he consulted with his lawyer."

At the conclusion of the processing at Quantico, Bunch was turned over to Investigator Cahill, who transported him to a Prince William County police substation. En route, Cahill asked Bunch "if he felt he was ready to sit down and go over the case." Cahill told Bunch that "[i]t was entirely up to him" and that "he certainly was not required to talk to [Cahill] if he didn't want to." Bunch stated that he had talked to the lawyer at Quantico and had been advised "not to say anything" and to talk to a civilian lawyer before talking to the police. Bunch added, however, that he had decided "he was ready to tell the whole story" and that "he wanted to get it off his chest."

At the substation, Bunch was advised of his *Miranda* rights, and he executed a "Warning and Consent" form. He then proceeded to give Cahill the confession that is now in controversy.

At the conclusion of the suppression hearing, the trial court ruled that Bunch had "intelligently, wittingly, freely and voluntarily . . . waived [his *Miranda*] rights" before he gave Cahill his

confession. Accordingly, the court held that the confession was admissible into evidence.

█ Bunch argues that the confession should have been suppressed because, despite his request, he was denied counsel during his interrogation in Japan, as the trial court found in holding inadmissible the incriminating statements he made there. Then, citing *Edwards* v. *Arizona*, 451 U.S. 477 (1981), Bunch asserts that he should not have been interrogated again until he was allowed to consult with counsel or unless he initiated the second interrogation himself. He did not initiate the second interrogation, Bunch maintains, and his discussion with Major Jillisky did not satisfy the requirement that he be allowed to consult counsel before he was interrogated further.

In *Edwards*, the accused was arrested for robbery, burglary, and murder. After he was informed of his *Miranda* rights, he indicated a willingness to submit to questioning. During the course of the interrogation by a police officer, the defendant stated he wanted an attorney, and the questioning ceased. The next morning, two detectives who were colleagues of the previous day's interrogator went to the jail and asked to see the accused. When informed of the request, the accused told the jail guard he did not want to talk to anyone. The guard told the accused that " 'he had' to talk" to the officers and took him to them. *Id.* at 479. They advised him of his *Miranda* rights. He indicated he was willing to talk and thereupon implicated himself in the crime.

Holding that the use of the accused's confession at trial violated his rights under the Fifth and Fourteenth Amendments, the United States Supreme Court reversed the conviction. In the course of its opinion, the Court stated:

> [W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. . . . [A]n accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

*Id.* at 484-85 (footnote omitted).

Factually, however, *Edwards* is distinguishable. Where the accused in *Edwards* was told " 'he had' to talk" to the police, in this case Bunch was advised "he certainly was not required to talk to [the police] if he didn't want to." Further, where *Edwards* involved an unequivocal statement by the accused that he wanted counsel, Bunch's statement here was couched in ambiguous terms to the effect that he *might* want to talk to a lawyer. And, where the accused in *Edwards* made his statement "without having had access to counsel," *id.* at 487, Bunch was allowed to consult with Major Jillisky, who gave Bunch the same advice, "not to say anything," that counsel of Bunch's own choosing or court-appointed counsel probably would have given him.

██ Furthermore, *Edwards* did not establish, as Bunch seems to suggest, a per se rule forbidding any finding of waiver of counsel unless subsequent interrogation is suspect-initiated. *Wyrick* v. *Fields*, 459 U.S. 42 (1982). Indeed, in *Wyrick*, the Supreme Court reversed summarily a holding of the United States Court of Appeals for the Eighth Circuit that *Edwards* had established such a per se rule. The Supreme Court stated that the Court of Appeals' holding "imposed a new and unjustified limit on police questioning of a suspect who voluntarily, knowingly, and intelligently waives his right to have counsel present [during questioning]." *Id.* at 43.

Although the Supreme Court stated in *Wyrick* that "the totality of the circumstances, including the fact that the suspect initiated the questioning, is controlling," *id.* at 48, the Court has not ruled that the only way a suspect may waive the right to counsel at a subsequent interrogation is by initiating the interrogation himself. Instead, the Court indicated in *Wyrick* that the ultimate test is whether the suspect makes a " 'knowing and intelligent relinquishment or abandonment' of his rights." *Id.* at 47.

██ The question, therefore, is whether, as the trial court found, Bunch made a knowing and intelligent waiver of his right to have counsel present at the time he confessed to Investigator Cahill on February 21. Whether such a waiver is made "depends in each case 'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.' " *Edwards*, 451 U.S. at 482 (quoting *Johnson* v. *Zerbst*, 304 U.S. 458, 464 (1938)). *See McFadden* v.

*Commonwealth*, 225 Va. 103, 300 S.E.2d 924 (1983), and *Simmons* v. *Commonwealth*, 225 Va. 111, 300 S.E.2d 918 (1983).

Bunch was no novice in police matters. A four-year veteran in the Marines with the rank of sergeant, he was a "correctional specialist" in the "military police field." Before he confessed to Investigator Cahill on February 21, he had been informed of his *Miranda* rights on three different occasions in the space of a little more than three days; he had received advice from Major Jillisky "not to say anything"; and he had been told he was not required to talk to Investigator Cahill. In response to this admonition from Cahill, Bunch acknowledged Major Jillisky's advice "not to say anything" and stated he had decided "he was ready to tell the whole story."

Even then, Investigator Cahill did not hasten to extract the story from Bunch. He again advised Bunch of his *Miranda* rights and he had him execute a "Warning and Consent" form. In the form, Bunch acknowledged, *inter alia*, that he had been advised he had the right to talk to a lawyer, to have the lawyer present during questioning, and to stop answering questions at any time. In addition, under a heading entitled "Consent to Speak" and directly over Bunch's signature, these statements appeared:

1. I understand my rights.
2. I do not want a lawyer.
3. No promise or threats have been made to me by anyone.
4. I understand and know the purpose of this interview.
5. I am willing to answer questions.

This is a case of an individual with background and experience in police matters who, despite repeated warnings of his rights and contrary to sound advice "not to say anything," decided "he was ready to tell the whole story" and "wanted to get it off his chest." Moments before confessing, he stated in writing that he did not want a lawyer and that he was willing to answer questions. We can conceive of no clearer case of a " 'knowing and intelligent relinquishment or abandonment' of [*Miranda*] rights," *Wyrick*, 459 U.S. at 47, and we hold, therefore, that the evidence fully sustains the trial court's finding that Bunch "intelligently, wittingly, freely and voluntarily . . . waived those rights."

The trial court's refusal to suppress Bunch's confession may be sustained on yet another ground. As Justice Powell pointed out

in a concurring opinion in *Edwards*, "police legitimately may inquire whether a suspect has changed his mind about speaking to them without an attorney." 451 U.S. at 490. Investigator Cahill's inquiry whether Bunch "felt he was ready to sit down and go over the case" amounted to nothing more than an effort to ascertain if Bunch had changed his mind about wanting an attorney and, hence, did not amount to police-initiated interrogation within the meaning of *Edwards*.

b. Suppression of Property Seized in Japan.

■ Bunch contends that the trial court erred in refusing to suppress a diamond and setting purportedly belonging to Thomas that was seized in a search of Bunch's barracks in Japan pursuant to a search warrant issued by a military commander. Bunch claims that the warrant was issued on the basis of his statement to Investigator Cahill that "the ring" was in Japan, a statement the trial court ruled inadmissible because made after Bunch had requested and been denied the assistance of counsel in Japan. Hence, Bunch concludes, because the ring was the "fruit of the poisonous tree," it "should have been excluded from evidence."

The trial court, however, made this specific finding with respect to the property seized in Japan: "[Cahill] didn't use a statement in order to get the search warrant or any acknowledgement from the defendant. He used other information." On brief, Bunch mentions this finding, but does not question its correctness. The finding is supported by the evidence and will not be disturbed here. *Stamper v. Commonwealth*, 220 Va. 260, 268, 257 S.E.2d 808, 814-15 (1979), *cert. denied*, 445 U.S. 972 (1980).

■ In connection with the search in Japan, Bunch also complains that he was not permitted to inspect the affidavit that supported the issuance of the search warrant. We fail to find in the record, however, any request by Bunch to inspect the affidavit or any ruling by the trial court concerning the matter. We will not notice the point now. Rule 5:21.

c. Suppression of Property Seized in Indiana.

■ Bunch contends that the trial court should have suppressed a string of pearls, allegedly belonging to Thomas, that was seized during a search of his mother's home in Indiana. Bunch states on brief that an Indiana search warrant, pursuant to which the search of his mother's home was conducted, listed only "a .22 caliber weapon and . . . two rings (diamond and pearl)." Because

the string of pearls was not identified in the warrant, Bunch maintains, it was not properly seized and should have been suppressed.

The Indiana search warrant is not in the record, and we cannot determine otherwise what items were listed in the warrant. Further, we cannot find where any question was raised in the trial court concerning the sufficiency of the warrant with respect to the string of pearls. As with all nonjurisdictional issues, a search and seizure question cannot be raised for the first time on appeal. Rule 5:21; *Girardi* v. *Commonwealth*, 221 Va. 459, 465-66, 270 S.E.2d 743, 747 (1980), *cert. denied*, 451 U.S. 913 (1981).

d. Denial of Discovery.

■ In a pretrial motion for discovery, Bunch requested, among other things, "[s]ummaries of any statements given to agents of the Commonwealth by persons the Commonwealth intends to call as witnesses upon the [trial] of [this matter]." Bunch argues that, given the seriousness of the charge upon which he was to be tried, the trial court should have exercised its discretion and granted his request in order to prevent a "trial by ambush."

Rule 3A:14(b)(2) provides that upon the written motion of an accused, the court shall order the Commonwealth's attorney to permit the accused to inspect and copy or photograph certain materials. The rule provides further, however, that "[t]his subparagraph does not authorize the discovery or inspection of statements made by Commonwealth witnesses or prospective Commonwealth witnesses to agents of the Commonwealth . . . ." Hence, the trial court did not err in denying discovery of the requested statements. *Bellfield* v. *Commonwealth*, 215 Va. 303, 306-07, 208 S.E.2d 771, 773-74 (1974), *cert. denied*, 420 U.S. 965 (1975).

## II. The Guilt Phase

a. Admissibility of Photograph of Deceased.

■ At trial, Bunch objected to the admission into evidence of a black and white facial photograph of Thomas, taken at the time of the autopsy. Bunch argues that because he conceded in opening statement having shot Thomas, it was unnecessary to use the morgue photograph to prove her identity. Furthermore, Bunch maintains, the photograph may have aroused the "sympathies and/or passions" of the jury and should not have been admitted.

We have said repeatedly that the admissibility of photographs is a matter within the sound discretion of the trial court, *e.g., Waye* v. *Commonwealth*, 219 Va. 683, 692, 251 S.E.2d 202, 208, *cert.*

*denied*, 442 U.S. 924 (1979), and *Peterson* v. *Commonwealth*, 225 Va. 289, 294, 302 S.E.2d 520, 523-24 (1983), and that we will not reverse the trial court's action except in cases of clear abuse of discretion. *Martin* v. *Commonwealth*, 221 Va. 436, 447, 271 S.E.2d 123, 130 (1980). We do not find any abuse of discretion here.

b. Admissibility of Items of Jewelry.

 Bunch contends that the trial court erred in admitting into evidence the Rolex watch recovered from the pawn shop, the diamond and setting seized in Japan, and the string of pearls seized in Indiana. Bunch argues that these items were not sufficiently identified as the property of the victim to be admissible into evidence.

We disagree with Bunch. Both in his confession and from the witness stand, Bunch admitted that he took Thomas's watch, diamond ring, and string of pearls. Thomas's former husband identified the items proffered at trial and said that they were "identical" with those owned by Thomas; he particularly noted the unusual nature of the clasp on the string of pearls.

Furthermore, the evidence showed that shortly after Thomas's death and the theft of her watch, diamond ring, and string of pearls, Bunch was in possession of goods of the type stolen. Hence, "strict proof of identity of the goods [was] not required." *Henderson* v. *Commonwealth*, 215 Va. 811, 813, 213 S.E.2d 782, 783 (1975).

c. Admissibility of Evidence of Another Crime.

 The Commonwealth called as a witness one Lynn Rider, in whose home Bunch resided at the time of Thomas's murder. Over Bunch's objection, Rider was permitted to state that approximately two weeks before the murder, Bunch proposed to Rider that the two of them "commit a robbery at a Pizza Hut." According to Rider, Bunch stated "he needed some money and he needed it bad." Rider refused to become involved and, in his words, "that really was as far as [the robbery plan] went."

Bunch concedes that evidence of other crimes is admissible to show the motive, intent, and knowledge of an accused when one or more of those elements is at issue in the trial of an offense. Bunch maintains, however, that, while the Commonwealth offered the disputed evidence to show that robbery was the motive for Thomas's murder, the evidence was inadmissible because "so re-

mote in time to the present offense as to be" without "probative purpose."

Whether evidence is so remote that it lacks probative value is a matter resting largely within the discretion of the trial court. In *Brown* v. *Commonwealth*, 208 Va. 512, 516-17, 158 S.E.2d 663, 667 (1968), we affirmed the admission into evidence of acts of incestuous intercourse occurring during a period of several years prior to the date of the offense on trial. In *Moore* v. *Commonwealth*, 222 Va. 72, 75-77, 278 S.E.2d 822, 824-25 (1981), involving charges of sexual enticement and fondling of a child, we approved the admission into evidence of similar acts occurring some twenty months before and three months after the date of the offense on trial. And in *Brooks* v. *Commonwealth*, 220 Va. 405, 406-07, 258 S.E.2d 504, 506 (1979), a case of welfare fraud, we sustained the admission into evidence of the defendant's convictions on four similar charges one month before the date of the offense on trial.

In the present case, the disputed evidence related to an incident occurring only two weeks before the date of Thomas's murder. Under these circumstances, we cannot say that the evidence was unduly remote; hence, we hold that the trial court did not abuse its discretion in admitting the evidence.

> d. Scope of Cross-Examination of Bunch.

▉ Bunch contends that the trial court erred in permitting the Commonwealth to cross-examine him excessively concerning his "contact with certain prostitutes the day before [Thomas's] death." Bunch argues that the testimony brought out on cross-examination was not "sufficiently related in time and subject matter to [Thomas's] death . . . to render [the] testimony . . . relevant."

Bunch concedes, as he should, that his own testimony on direct examination "opened the door" to inquiry into "this subject area." The permissible scope of cross-examination on the subject became, therefore, a matter for the exercise of discretion by the trial court; we will not interfere with the court's action " 'unless [its] discretion has been plainly abused.' " *Spruill* v. *Commonwealth*, 221 Va. 475, 485, 271 S.E.2d 419, 425 (1980) quoting from *Worrell* v. *Kinnear Co.*, 103 Va. 719, 724, 49 S.E. 988, 990 (1905). We find no abuse of discretion here.

> e. Sufficiency of Evidence of Robbery.

■ Bunch contends that the trial court erred in failing to grant his motion to strike the evidence on the charge of capital murder at the conclusion of the Commonwealth's case. Bunch points out that the burden was upon the Commonwealth to prove Thomas was killed during the commission of robbery; as part of this burden, the Commonwealth was required to show there was a taking of property from the person or presence of Thomas. Yet, Bunch maintains, "the Commonwealth presented no evidence as to the items being taken from the person of Mrs. Thomas or from her presence." It is reasonable to infer, Bunch states, "that the items mentioned could have been taken from parts of the residence away from where the victim was shot." Furthermore, Bunch asserts, "at least one if not two hours elapsed between the shooting of Mrs. Thomas and the taking of the items of personal property." Under these circumstances, Bunch concludes, the evidence was sufficient to make a prima facie case of homicide and larceny, but not of capital murder in the commission of robbery.

Bunch, however, waived the right to rely upon his motion to strike, made at the conclusion of the Commonwealth's case, by introducing evidence in his own behalf. We determine whether the evidence of robbery was sufficient, therefore, upon the whole record. *Hargraves* v. *Commonwealth*, 219 Va. 604, 605, 248 S.E.2d 814, 815 (1978).

■ Robbery is a common law offense, defined as " 'the taking, with intent to steal, of the personal property of another, from his person or in his presence, against his will, by violence or intimidation.' " *Mason* v. *Commonwealth*, 200 Va. 253, 254, 105 S.E.2d 149, 150 (1958). The essential element of violence must precede or be concomitant with the taking of property from the person or presence of the owner. *Stamper*, 220 Va. at 274, 257 S.E.2d at 818.

■ We believe the evidence is overwhelming that Thomas was killed during the commission of robbery. As indicated in Part II (c) of this opinion, the witness Rider testified that approximately two weeks before Thomas's murder, Bunch said he "needed some money and . . . needed it bad." Rider testified further that on January 29, two days before Thomas's murder, Bunch stated he "ought to . . . go up there to Dale City and knock that bitch [Thomas] off . . . and get her rings and things." In his confession to Investigator Cahill, Bunch stated that "when he woke up" on the morning of January 31, "he decided that was

the day he was going to kill [Thomas]." His plan, Bunch said, was "to go down and take her jewelry and kill her and leave the area." He killed Thomas, Bunch continued, "because she was a slut and she reminded him too much of his wife and he wanted her money."

During Bunch's cross-examination at trial, he admitted that after he shot Thomas and "[j]ust before" he "hung her up," he removed from her body the ring he "ended up with over in Japan" as well as "[a] chain and a watch and another ring." Bunch claimed in his testimony that Thomas was dead when he "hung her up," but the record indicates otherwise. While awaiting trial, Bunch told a fellow jail inmate that "[w]hen he hung [Thomas] up he thought she was still alive." And medical evidence recited *infra* indicated that Thomas was still alive when Bunch "hung her up."

Thus, the evidence shows clearly that on January 31, 1982, Bunch went to Thomas's home with the intent to kill her and steal her property, that he did kill her as planned, and that he did steal property from her person. She may or may not have been alive at the time he stole her property, and she may even have been dead for some time when he accomplished the theft. Neither of these eventualities is material, however; the important considerations are that robbery was the motive for the killing and that Bunch had the intent to rob when he killed Thomas. *Whitley* v. *Commonwealth*, 223 Va. 66, 73, 286 S.E.2d 162, 166, *cert. denied*, 459 U.S. 882 (1982); *see also Wm. Patterson* v. *Commonwealth*, 222 Va. 653, 664, 283 S.E.2d 212, 219 (1981). Nor does it make any difference whether, as Bunch asserts, "the items [stolen] could have been taken from parts of the residence away from where the victim was shot." The phrase " 'of the personal property of another, from his person or in his presence' has been broadly construed to include the taking of property from the custody . . . or . . . the constructive possession of . . . another." *Durham* v. *Commonwealth*, 214 Va. 166, 168, 198 S.E.2d 603, 605-06 (1973).

### f. Instructions on Second Degree Murder.

 Citing the rule that every killing is presumed to be murder of the second degree, Bunch contends the trial court erred in refusing instructions that would have permitted the jury to consider this lesser offense. Bunch asserts that he "testified in a manner which would allow the trier of fact to conclude that he acted with-

out premeditation"; therefore, "[t]o hold as a matter of law that no case exists for second degree murder is to invade the province of the jury."

We disagree with Bunch. He fails to point out where in the record we might find any evidence that "would allow the trier of fact to conclude that he acted without premeditation." All the evidence, including the testimony from Bunch himself, showed that Thomas's killing was a premeditated act. An accused is not entitled to instructions on lesser included offenses "solely because the case is one of murder." *Clark* v. *Commonwealth*, 220 Va. 201, 209, 257 S.E.2d 784, 789 (1979), *cert. denied*, 444 U.S. 1049 (1980). A "second-degree-murder instruction is appropriate only where there is evidence to support it." *Justus* v. *Commonwealth*, 222 Va. 667, 678, 283 S.E.2d 905, 911 (1981), *cert. denied*, 455 U.S. 983 (1982). *See also Hopper* v. *Evans*, 456 U.S. 605 (1982).

### III. The Sentencing Phase

a. Constitutional Challenges.

 Bunch attacks Virginia's death penalty statute as "being overly inclusive." This overbreadth, Bunch maintains, creates the substantial risk that a sentence of death will be imposed arbitrarily and capriciously, contrary to the holding in *Furman* v. *Georgia*, 408 U.S. 238 (1972). Repeatedly, however, in decisions from *Smith* v. *Commonwealth*, 219 Va. 455, 248 S.E.2d 135 (1978), *cert. denied*, 441 U.S. 967 (1979), to *LeVasseur* v. *Commonwealth*, 225 Va. 565, 304 S.E.2d 644 (1983), we have upheld the statute against similar attacks. We reaffirm those holdings.

b. Sufficiency of Evidence of Aggravating Circumstances.

 Under Virginia's death penalty statute, a sentence of death may not be imposed unless there is proof of either (1) dangerousness, *viz.*, that there is a probability the defendant would commit criminal acts of violence which would constitute a continuing threat to society, or (2) vileness, *viz.*, that the defendant's conduct in committing the offense was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim. Code §§ 19.2-264.2, -264.4(C). Because Bunch had no prior criminal record, the trial court refused to permit the jury to consider the aggravating circumstance of dangerousness, but submitted the case to the jury on the vileness standard, and the jury based its verdict upon that

standard. Bunch contends the court erred in permitting the jury to consider the death penalty at all.

Citing *Godfrey* v. *Georgia*, 446 U.S. 420 (1980), Bunch contends that the three statutory terms of torture, depravity of mind, and aggravated battery must be considered together in determining vileness, with the result that "depravity of mind does not exist in the situation where there is no torture and where there is no aggravated battery to the victim." Bunch concedes this interpretation is not constitutionally mandated by *Godfrey*, but he suggests it is "a direction in which [this] Court might wish to go."

We reject Bunch's suggestion. We believe a mere inspection of the statutory language in question demonstrates clearly that the term "vileness" includes three separate and distinct factors, with the proof of any one factor being sufficient to support a finding of vileness and hence a sentence of death. Code §§ 19.2-264.2 and -264.4(C) define vileness as conduct that involves torture, depravity of mind, *or* aggravated battery to the victim; the use of the disjunctive word "or," rather than the conjunctive "and," signifies the availability of alternative choices. Hence, depravity of mind can exist independently of the presence of torture or aggravated battery and may alone support a finding of vileness as a basis for a sentence of death.[1]

We have interpreted depravity of mind, as used in its statutory context, to mean "a degree of moral turpitude and psychical debasement surpassing that inherent in the definition of ordinary legal malice and premeditation." *Smith*, 219 Va. at 478, 248 S.E.2d at 149. We believe that Bunch's conduct as depicted in the record clearly revealed a depraved mind within this definition.

Bunch planned days ahead to murder and rob Thomas, a woman with whom he had been involved in an intimate relationship. She was not the only object of his murderous musings, however; he "wanted to kill somebody," and he thought about "killing some prostitutes." In any event, when he awoke on January 31, he decided he would kill and rob Thomas that day. He went to her home about noon, had intercourse with her, and left with the promise to return later. He returned at 6:00 p.m. and invited her to go to dinner. While she dressed, he "drank some wine."

---

[1] For the reasons expressed in the text, we reject Bunch's contention that the trial court erred in instructing the jury in the disjunctive on the factors of torture, depravity of mind, and aggravated battery.

When Thomas announced she was "ready to go," Bunch started playing "hide and . . . seek" with her. He hid in the bathroom, and when she found him, she said, "okay . . . let's go." As they walked down the hallway, he shot her. He felt "real good when he shot her, to the point where he actually had a sexual orgasm."

During the next hour or so, with Thomas dying on the floor, Bunch amused himself drinking Thomas's wine, listening to music, and ransacking her house. He had "a euphoric feeling about the whole thing."

After some two hours, Bunch tied a knot in a scarf Thomas was wearing, dragged her to a door, and "draped the scarf over the doorknob." He "hung her up . . . to make sure she didn't talk and there were no witnesses around." After Bunch "exerted [himself] by pulling [Thomas] across the floor," he had a "blood flow" to his "sexual parts" and experienced a "feeling" of a "full erection." Before leaving the house with Thomas's jewelry and other items, Bunch wiped his fingerprints "off everything" and "took the phone off the hook."

Bunch told Investigator Cahill that he had "gotten a thrill" from killing Thomas, that he "wanted to kill some more," and that he "would have killed some hookers . . . if he had stayed in the area." Earlier, Bunch had told his friend Rider that he would like "to maybe become a hit man or a mercenary," and he told another friend he "wanted to be in the Mafia."

Investigator Cahill gave a final word of testimony relating to the depravity-of-mind issue. He was asked while on the witness stand whether Bunch displayed any remorse or sorrow for killing Thomas. Cahill replied, "No, sir."

Bunch argues, however, that his sentence of death is impermissible under *Godfrey*. In our opinion, the circumstances surrounding Thomas's death clearly distinguish this case from *Godfrey*. There, in a prosecution for capital murder under a statute defining vileness in terms identical with our statutory language, the defendant was sentenced to death for killing his wife and mother-in-law. Believing that the mother-in-law had prevented a reconciliation with his wife, he went to the mother-in-law's trailer and fired a shot through a window, killing his wife instantly; he entered the trailer and shot his mother-in-law, killing her instantly. He then called the sheriff's office, reported the crimes, and asked to be arrested. He later told an officer he had committed "a hideous crime." 446 U.S. at 426.

Holding that the validity of the defendant's death sentence turned on whether, in light of the facts and circumstances, the Georgia Supreme Court had applied a constitutional construction of the depravity-of-mind factor, the United States Supreme Court stated that "the answer must be no." *Id.* at 432. The Court pointed out that the defendant's victims were killed instantly, that they were family members who were causing him extreme emotional trauma, and that he acknowledged his responsibility for his acts and the heinous nature of his crimes.

In stark contrast, the facts of this case display extreme baseness. Bunch, with no provocation whatsoever from his victim, planned her murder with cold-hearted calculation and larcenous intent. He carried out his murderous plan in true "hit man" style of complete detachment, yet with a bizarre sexual reaction on his part. As she lay dying, he removed her jewelry and enjoyed himself by partaking of her wine, listening to music, and rifling through her personal belongings. Then, in a final gesture of contempt for his victim and to make certain she would never bear witness against him, he garroted her, dragged her across the floor, and hung her from a doorknob, the exertion causing his sexual arousal. From these facts, the jury clearly could find that an utter depravity of mind accompanied the murder in this case.

■ Bunch also contends that proof of an aggravated battery requires "evidence of serious physical abuse of the victim before death." There is "no compelling evidence" in this case, Bunch maintains, "to support the proposition that the victim . . . suffered an aggravated battery prior to her death."

We considered an identical contention in *Whitley*. There, we said:

> The statutory construction Whitley urges, one announced by the Georgia Supreme Court in *Blake* v. *State*, 239 Ga. 292, 236 S.E.2d 637 (1977), and noted in passing in *Godfrey*, was not the *ratione decidendi* in *Godfrey*. Godfrey's victim died almost instantaneously from a single gunshot, and the defendant's sentence was "based upon no more than a finding that the offense was 'outrageously or wantonly vile, horrible and inhuman.'" *Godfrey*, 446 U.S. at 428. Such an amorphous finding, unrelated to any constituent element of the statutory definition, was constitutionally insufficient to support the death penalty. The Supreme Court was not re-

quired to decide, and did not decide, whether an aggravated battery must precede the victim's death in order to satisfy the vileness standard.

Nor need we decide that question here, for the evidence fully supports the conclusion that [the victim's] death was the result of aggravated battery upon her person. . . . We have construed the term "aggravated battery" as used in Code § 19.2-264.2 to mean "a battery which, qualitatively and quantitatively, is more culpable than the minimum necessary to accomplish an act of murder."

223 Va. at 78-79, 286 S.E.2d at 169-70 (footnote omitted) (citation omitted).

We believe that *Whitley's* rationale is applicable here and, hence, we need not decide in this case whether proof of an aggravated battery required evidence of serious physical abuse of the victim before death. From the evidence previously recited, the jury could have found that Bunch shot Thomas and then, while she was still alive, garroted her and hung her on the doorknob until she succumbed. This, clearly, was an aggravated battery to Thomas's person, *viz.*, one "which, qualitatively and quantitatively, [was] more culpable than the minimum necessary to accomplish an act of murder." *Id.* at 79, 286 S.E.2d at 170.

Bunch asserts, however, that his version of the shooting, which he says was "not contradicted by any other evidence," was that he shot the victim "once in the head, as she walked away from him," that she "did not see [Bunch] preparing to shoot her," and that she immediately lost and never regained consciousness. Hence, Bunch maintains, the shooting, even when coupled with the subsequent hanging, did not amount to an aggravated battery.

The medical examiner testified, however, that the bullet struck Thomas, not in the back of the head, but on the left side above her ear and that the bullet's path was "toward the back, downward, and to the deceased's right." As the Attorney General suggests on brief, the doctor's testimony permitted the inference that Bunch was "standing above and facing [Thomas] at her side with the gun pointing down" and that she knew Bunch "was preparing to shoot her."

Furthermore, the medical examiner testified that Thomas could have lived "for an hour to two hours" after she was shot. The doctor also stated that Thomas's lungs "exhibited congestion" and

that with "constriction around the neck, one would get congestion of the lungs." After stating these observations, the medical examiner opined that "this was a combined cause of death due to a gunshot wound to the head and . . . with a secondary complication, asphyxiation by hanging." From this and other evidence previously recited, the jury could infer that Thomas was still alive when Bunch "hung her up" and thus could conclude that she was the victim of an aggravated battery to her person.

c. Closing Argument of the Commonwealth's Attorney.

 Bunch contends that because the trial court ruled the jury could consider the aggravating circumstance of vileness but not dangerousness, it was error for the court to permit the Commonwealth's attorney in his closing argument to comment upon evidence which pertained to dangerousness. We reject this contention. The trial court's ruling on dangerousness did not foreclose the Commonwealth's attorney from commenting on evidence that tended to establish both dangerousness and vileness. The portions of the closing argument Bunch challenges concerned evidence of this dual character. It was not improper for the Commonwealth's attorney to comment upon this evidence in an effort, as he told the jury, to show that Bunch's stated desire "to kill somebody" indicated "a depraved person."

d. Instructions Defining Torture, Depravity of Mind, and Aggravated Battery.

 As indicated previously, the trial court in the sentencing phase of the case permitted the jury to consider only the aggravating circumstance of vileness. In an instruction generally tracking, but expanding upon, the language of Code § 19.2-264.4(C), the court told the jury in pertinent part that:

Before the penalty can be fixed at death, the Commonwealth must prove beyond a reasonable doubt that the Defendant's conduct in committing the offense was outrageously or wantonly vile, horrible or inhuman, in that it involved:

a. torture; or

b. depravity of mind; or

c. aggravated battery to the victim *beyond the minimum necessary to accomplish the act of murder.* [Emphasis added.][2]

---

[2] The italicized words were added to the statutory language by the trial court.

Bunch contends the trial court erred in denying instructions he proffered which, he says, would have properly defined the terms "torture," "depravity of mind," and "aggravated battery." We disagree with Bunch. We held in *Clark* that it is not reversible error for a trial court to refuse to define the statutory terms included in the aggravating circumstances upon which a sentence of death may be based. 220 Va. at 211, 257 S.E.2d at 790.

Bunch argues, however, that *Godfrey* mandates definitional instructions and thus overrules *Clark*. We do not concur in Bunch's reading of *Godfrey*. The court's concern there was not with the trial court's instructions, but with the Georgia Supreme Court's adoption, contrary to its earlier holdings, of such a broad construction of the term "depravity of mind" that the death penalty could be imposed for crimes reflecting "a consciousness materially [no] more 'depraved' than that of any person guilty of murder." 446 U.S. at 433. But, given the lesson of *Godfrey* and considering the construction we have applied consistently to the term "depravity of mind" ever since our first decision on the subject in *Smith*,[3] we do not believe there can exist in Virginia the danger expressed in *Godfrey* that the death sentence might be imposed on " 'caprice or emotion.' " 446 U.S. at 433.

We adhere to the view expressed in *Clark*, therefore, and hold that the trial court's instruction on vileness was sufficient. Indeed, "[a]s to the trial court, *Godfrey* does not require that the court do any more than state exactly what the statute says." *Westbrook* v. *Zant*, 518 F. Supp. 1262, 1264 (M.D. Ga. 1981); *accord Stamper* v. *Baskerville*, 531 F. Supp. 1122, 1130-31 (E.D. Va. 1982).

e. Failure of Trial Court to Set Aside Death Sentence.

Under Code § 19.2-264.5, before imposing sentence when punishment has been fixed at death, the trial court shall consider the report of a probation officer as well as all other relevant facts and, "upon good cause shown," may set aside the sentence of death and impose a life sentence. Bunch contends the trial court erred in not setting aside his death sentence.

In its verdict, the jury found that Bunch's conduct in committing the offense was "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or aggravated battery to the victim beyond the minimum necessary to accomplish the act of murder."

[3] In *Smith*, we interpreted the term "depravity of mind" as "a degree of moral turpitude and psychical debasement surpassing that inherent in the definition of ordinary legal malice and premeditation." 219 Va. at 478, 248 S.E.2d at 149.

The record shows that the trial court received the report and heard the testimony of a probation officer and also heard the testimony of Robert Showalter, M.D., a psychiatrist. After hearing argument of counsel, the trial judge stated that he had spent "many, many hours reviewing the evidence" and had compared Bunch's sentence with "all the cases involving the death penalty" that "were forwarded to [him] by the Supreme Court" pursuant to Code § 17-110.1(E). The judge concluded that he would not "interfere with the jury's verdict."

Bunch's argument on this point stresses his lack of a prior criminal record. He also emphasizes the testimony of the psychiatrist to the effect that Bunch was under extreme emotional distress at the time he murdered Thomas and yet is capable of rehabilitation. As the Attorney General points out on brief, however, the record unerringly supports the proposition that the murder of Thomas "resulted from a depraved and evil mind, rather than a disturbed one." Hence, we do not believe Bunch established "good cause" sufficient for the trial court to set aside the sentence of death.

### IV. Propriety of the Death Sentence

Under Code § 17-110.1(C), we are required to determine whether the death sentence was "imposed under the influence of passion, prejudice or any other arbitrary factor." We are also obligated to decide whether the sentence is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

#### a. Product of Passion.

Here, Bunch reiterates his contention that there was insufficient evidence of vileness to support the death penalty. He also adverts to the testimony concerning his contact with certain prostitutes the night before Thomas's murder. He then reasons that the jury must have been offended by the testimony concerning the prostitutes and that the death verdict, therefore, was the product of passion, prejudice, or some other arbitrary factor.

We disagree with Bunch. We have previously demonstrated that the evidence of vileness was amply sufficient to support the death penalty. Given the depravity of mind exhibited by Bunch on the day of Thomas's murder, we do not believe that the evidence of his contact with prostitutes the night before would have swayed the jury to return a death verdict if not otherwise so inclined.

#### b. Excessiveness and Disproportionality.

■ In this connection, Bunch belabors his lack of a prior criminal record, and he repeats his assertions that Thomas was unaware she was about to be shot and that she was either dead or unconscious when he hung her by the neck "over the doorknob." He then argues that his sentence of death is excessive and disproportionate.

Bunch cites three cases in which we upheld the death penalty but where, he says, there was evidence not only of the defendants' "prior criminal record and/or history involving crimes of violence" but also of torture or aggravated battery to the victims while still conscious.[4] Because, Bunch argues, he had "*no* prior criminal record" and the evidence of aggravated battery "*at most*" showed he tied the scarf around the victim's neck while she was unconscious although still alive, the "factual pattern" of this case "does not come within the legislative intent with regard to the imposition of the ultimate penalty."

Aside from the fact that the record does not support the "factual pattern" which forms the basis of Bunch's argument, the argument is fallacious. The presence or absence of a criminal record is pertinent to the dangerousness standard. Bunch's argument suggests that a defendant without a criminal record but who commits a murder satisfying the vileness standard cannot be sentenced to death and, conversely, that a defendant as to whom the dangerousness standard is satisfied but whose crime does not meet the vileness test cannot be sentenced to death either. Code §§ 19.2-264.2 and -264.4(C) state the dangerousness and vileness standards in the disjunctive; only one, not both, need be present to support a valid sentence of death.

■ Responsive to Code § 17-110.1(E), we have accumulated "the records of all capital felony cases . . . as a guide in determining whether the sentence imposed in the case under review is excessive." We have compared Bunch's case with those cases, giving particular emphasis to the instances where the death sentence

---

[4] *Stamper v. Commonwealth*, 220 Va. 260, 257 S.E.2d 808 (1979), *cert. denied*, 445 U.S. 972 (1980) (three restaurant employees murdered during the commission of robbery; defendant had extensive record of violent crime); *Coppola v. Commonwealth*, 220 Va. 243, 257 S.E.2d 797 (1979), *cert. denied*, 444 U.S. 1103 (1980) (victim murdered during commision of robbery; no evidence of prior criminal record or history involving crimes of violence); *Mason v. Commonwealth*, 219 Va. 1091, 254 S.E.2d 116, *cert. denied*, 444 U.S. 919 (1979) (elderly woman murdered during commission of rape; defendant had extensive criminal record).

was based upon vileness. *LeVasseur* v. *Commonwealth*, 225 Va. 565, 596, 304 S.E.2d 644, 661 (1983). As a result, we are satisfied that Bunch's sentence of death is not excessive or disproportionate. While his prior record may not have warranted a finding of dangerousness, the vileness of his offense, as exemplified by the aggravated battery he committed upon Thomas and the depravity of mind with which he executed the crime, at least equals any vileness we have encountered in other cases, including those cited by Bunch, *viz.*, *Stamper, Coppola*, and *Mason*, as well as *LeVasseur*, decided since this matter was argued before the Court.

For the reasons assigned, we will neither disturb the trial court's rulings nor commute Bunch's sentence of death.

*Affirmed.*